Peter FAZIO, Shari Fazio, and
Eric Fazio, Appellants

v.

CYPRESS/GR HOUSTON I, L.P., Cypress/GR Houston, Inc., and Cypress Equities, Inc., Appellees

Cypress/GR Houston I, L.P., Cypress/GR Houston, Inc., and Cypress Equities, Inc., Appellants

v.

Peter Fazio, Appellee.

No. 01–09–00728–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 5, 2013.

Sanford L. Dow, J.W. Beverly, Houston, TX, for Appellants.

Polly Graham, Arlen Ross Levy, Houston, TX, for Appellees.

Justice BLAND, joined by Chief Justice RADACK, and by Justices MASSENGALE, BROWN, and HUDDLE, for the en banc court.

## EN BANC OPINION

JANE BLAND, Justice.

In this suit arising from the sale of land, we examine the appropriate measure of damages for a sale obtained through fraudulent inducement. A jury concluded that the seller of the land had failed to disclose material information to the buyer about the financial state of a commercial tenant who leased the land. But the jury further concluded that the buyers suffered nothing in damages proximately caused by the fraud, measured at the time of the sale, and it awarded no damages in connection with the costs incurred with the termination of the tenant's lease, nor the legal fees the buyers incurred due to the tenant's bankruptcy, nor the interest expense the buyers incurred on loans they obtained to facilitate the purchase. The trial court entered a take-nothing judgment in favor of the seller.

A majority of a panel of our court reversed the trial court, concluding that the buyers were nonetheless entitled to damages based on the loss that the buyers took when they sold the land three years later. The majority also concluded, with one justice dissenting, that the buyers did not disclaim reliance on the seller's promise of full disclosure in a letter of intent that the seller had signed before the sale. The seller moved for rehearing and rehearing en banc. The panel majority granted the motion for rehearing and revised its opinion, mooting the en banc request, but its disposition remained the same. The seller moved again for en banc consideration. Concluding that the case warranted en banc review, a majority of our court has voted to reconsider this case. *See* TEX.R.APP. P. 49.7. We withdraw the panel's August 16, 2012 opinion on rehearing and judgment, and substitute this opinion and judgment in its place.

We hold that the trial court properly entered a take-nothing judgment, because the jury found that no damages were proximately caused by the fraud, measured at the time of the sale, and it found no incidental or consequential damages relating to the sale. We further hold that the trial court properly denied the seller's request for attorney's fees as the prevailing party, because the parties' contract did not provide for a recovery for attorney's fees incurred in defense against claims of fraud. We therefore affirm.

### Background

Peter, Shari, and Eric Fazio sued Cypress/GR Houston I, L.P., Cypress/GR Houston, Inc., and Cypress Equities, Inc. (collectively, Cypress) for fraudulent inducement, relating to the Fazios' purchase, in October 2003, of commercial land locat-

ed on the frontage road of Interstate 10 in Houston. At that time, Garden Ridge Pottery leased the site for one of its retail stores.

After identifying the land as an investment prospect, the Fazios notified Cypress of their interest in purchasing it. In early September 2003, the parties executed a letter of intent, signed by Peter Fazio and a representative of Cypress Equities, in which Cypress agreed to allow the Fazios to investigate "all aspects of the Property" and further agreed to provide the Fazios with "all information in [Cypress's] possession." The Fazios and their brokers subsequently conducted due diligence and inspected the property. As part of this process, they requested "every scrap of paper" that Cypress had regarding the property. The Fazios reviewed multiple appraisals of the property; researched the property's primary tenant, Garden Ridge; investigated the lease terms; reviewed Garden Ridge's audited financial statements; and contacted Garden Ridge's CFO for an assessment of Garden Ridge's financial condition. The Fazios' investigations revealed that Garden Ridge was restructuring and struggling financially, but that Garden Ridge had recently secured a line of credit for its operations to continue through the 2003 Christmas season. During their discussions with Garden Ridge's CFO, the CFO was optimistic that Garden Ridge could work through its financial difficulties. The Fazios' own lenders were not as certain, and told the Fazios that Garden Ridge was not a viable long-term tenant. Garden Ridge's audited financial statements, which the Fazios reviewed, showed that Garden Ridge had defaulted on its debt covenants and was in the process of corporate restructuring.

Despite its agreement in the letter of intent to provide to the Fazios "all information in its possession," Cypress did not disclose to the Fazios that, in February 2003, Garden Ridge had sent a letter to Cypress stating that it was "restructuring" and needed "to reduce our occupancy costs at your premises." Cypress also did not disclose that Garden Ridge had sought a 30% rent reduction for the I–10 property as well as a similar reduction for another property owned by a separate Cypress entity and leased to Garden Ridge. Finally, Cypress failed to disclose that in early September 2003, Cypress's own lender was concerned about the financial condition of Garden Ridge and had asked that Cypress's President, Chris Maguire, execute a personal guaranty for the $5,704,000 loan that it had made to Cypress that had been formerly secured only by the property. Maguire eventually signed the guaranty—on September 25, one day after Cypress sold the land to the Fazios.

The parties executed the final purchase agreement on September 24, 2003 for a price of $7,667,000. The agreement contained various provisions disclaiming the Fazios' reliance on representations made by Cypress to the Fazios.

Garden Ridge paid its rent in October, November, and December, but it defaulted on its rent in January 2004, and shortly thereafter declared bankruptcy. Once in Chapter 11 bankruptcy protection, Garden Ridge rejected its lease. The Fazios attempted, unsuccessfully, to re-lease the land. They later sold it in 2007 for $3,750,000.

The jury found that Cypress Equities, but neither of the other Cypress entities, had defrauded the Fazios. It attributed 100% responsibility for any harm to the Fazios to Cypress Equities, but it found that the Cypress entities operated as a single business enterprise.

The trial court instructed the jury on two measures of direct damages, and various measures of incidental and consequen-

tial damages. The trial court's two measures for actual damages were distinctly different: Jury question 2(1) instructed the jury to determine "[t]he difference between the price the Fazios paid for the Property and the amount they received when they sold the Property"; to this question, the jury answered $3,961,524.60, which is the actual difference in the two amounts. Question 2(2), in contrast, instructed the jury to determine "the difference, if any, between the price the Fazios paid for the Property and the value of the Property at the time the Purchase Agreement was executed"; to this question, the jury answered $0. In response to each of four instructions on incidental and consequential damages, the jury also answered $0. But, finding clear and convincing evidence of fraud, the jury awarded $667,000 in exemplary damages.

Both parties moved for judgment in the trial court. Among other grounds, Cypress argued that the Fazios were not entitled to a judgment based on the jury's answer to question 2(1) because it was an improper measure of damages, and that it, Cypress, was entitled to judgment based on the jury's answer to question 2(2), in which the jury awarded nothing under the proper measure of damages. The Fazios requested judgment on the jury's verdict for the amount the jury found in answer to question 2(1), plus exemplary damages. After extensive post-verdict briefing, the trial court entered a take-nothing judgment for Cypress and denied Cypress's request for attorney's fees.

The Fazios appeal the trial court's judgment against them on their claim for fraudulent inducement, contending that the trial court erred in disregarding the jury's liability and damages findings in their favor. They contend that the trial court instead should have disregarded the damages questions the jury found against

them. Cypress also appeals, challenging the trial court's denial of its motion for attorney's fees.

## Damages

### A. Standard of Review

The Fazios challenge the trial court's judgment disregarding question 2(1), arguing that the question was a proper measure of damages. A trial court should disregard a jury finding if the jury question to which the finding responds is legally defective; the answer to a legally defective question is immaterial to the judgment. *See Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994); *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Similarly, a trial court should disregard a jury finding if the evidence is legally insufficient to support it, or if a directed verdict would have been proper because a legal principle precludes recovery. Tex.R. Civ. P. 301; *see Fort Bend Cnty. Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991); *Williams,* 137 S.W.3d at 124; *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

### B. Measuring Direct Damages

There are two measures of direct damages in a fraud case: out-of-pocket and benefit-of-the-bargain. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997)). Out-of-pocket damages measure the difference between the amount the buyer paid and the value of the property the buyer received. *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984). Benefit-of-the-bargain damages measure the difference between the value of the property as represented and

the actual value of the property. *Id.* Both measures are determined at the time of the sale induced by the fraud. *Id.; Arthur Andersen*, 945 S.W.2d at 817; *Woodyard v. Hunt*, 695 S.W.2d 730, 733 (Tex.App.-Houston [1st Dist.] 1985, no writ); *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 728–30, 2012 WL 6082713, at *7–8 (Tex.App.-Houston [1st Dist.] 2012, no pet. h.).

▮ Losses that arise after the time of sale may be recoverable as consequential damages in appropriate cases. *Formosa Plastics*, 960 S.W.2d at 49 n. 1 (citing *Arthur Andersen*, 945 S.W.2d at 817). Consequential damages must be foreseeable and directly traceable to the misrepresentation and result from it. *Arthur Andersen*, 945 S.W.2d at 816. An investor may not "shift the entire risk of an investment to a defendant who made a misrepresentation" if the loss is unrelated to the misrepresentation and due to market fluctuations or the chances of business. *Id.* at 817; *see Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938). Jury instructions on consequential damages must be explicitly premised on findings that the losses were foreseeable and directly traceable to the misrepresentation. *El Paso Dev. Co. v. Ravel*, 339 S.W.2d 360, 366–67 (Tex.App.-El Paso 1960, writ ref'd n.r.e.); *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 464 (Tex.App.-Dallas 1988, writ denied).

▮ The jury instructions in this case included two questions on direct damages, questions 2(1) and 2(2). Jury question 2(1) instructed the jury to determine the difference between the actual price that the Fazios paid for the property and the actual price at which they sold it more than three years later, without consideration of any fluctuations in value absent any fraud. Because the question does not isolate the reduction in value attributable to the fraud, it asks a math word problem of basic subtraction, and is not a proper measure of damages.

In contrast, jury question 2(2) has it right, because that question parallels the rule for calculating out-of-pocket damages. Question 2(2) properly instructed the jury to determine the difference between the fraud-induced price that the Fazios paid for the property and the actual value of the property they received when they purchased it. *See Leyendecker*, 683 S.W.2d at 373; *Arthur Andersen*, 945 S.W.2d at 817. And, the question correctly focused the jury on the time of the sale, because direct damages for fraud, including out-of-pocket damages, are properly measured at the time of the sale induced by the fraud—in this case, when the purchase agreement was executed—and "not at some future time." *Woodyard*, 695 S.W.2d at 733; *see Leyendecker*, 683 S.W.2d at 373; *Arthur Andersen*, 945 S.W.2d at 817. The jury responded that such damages were $0. It found other sorts of incidental and consequential damage to be $0 as well, in questions 2(3), 2(4), 2(5), and 2(6). The Fazios did not challenge the legal sufficiency of any of these findings.

The Fazios contend, and the dissents agree, that jury question 2(1) instructed the jury on a proper measure of damages, and thus the trial court erred in disregarding it. The dissent cites *Henry S. Miller Co. v. Bynum* to support its position that fraud damages need not be measured at the time of sale, but may be measured as the loss on the Fazios' investment three years after the sale. 836 S.W.2d 160, 162–63 (Tex.1992). But more than a decade ago, our court cast a similar erroneous interpretation of *Bynum* to hold that the plaintiff in a fraud action could recover the loss on its investment, and not merely time-of-sale damages, when the plaintiff invested in a business that went bankrupt just over a year later. The case was *Ar-*

*thur Andersen & Co. v. Perry Equip. Corp.,* and the Texas Supreme Court reversed our court. *See* 898 S.W.2d 914 (Tex.App.-Houston [1st Dist.] 1995), *rev'd,* 945 S.W.2d 812 (Tex.1997). In *Arthur Andersen,* the Texas Supreme Court expressly rejected such an interpretation, holding that, under the common law measure of fraud damages, direct damages must be measured at the time of the sale that induced the fraud. *Arthur Andersen,* 945 S.W.2d at 817. It further held that losses beyond the difference between the amount the plaintiff paid and the value it received at the time of sale could be recovered only as consequential damages. *Id.* Jury question 2(1) does not measure damages that were foreseeable and directly traceable to the misrepresentation, and thus, as the Fazios concede, was not an instruction on consequential damages. *See Ravel,* 339 S.W.3d at 366–67. The jury found $0 damages in response to four measures of incidental and consequential damages on which it was instructed.

■ Because jury question 2(1) did not instruct the jury on a valid measure of damages, and the jury found zero in damages in response to the proper instructions on direct and consequential damages, the trial court properly disregarded the damages found in response to question 2(1) and accorded judgment based on the jury's zero damages finding in answer to questions 2(2) through 2(6).

### C. Rescission Damages

■ The Fazios also contend that jury question 2(1) instructs the jury on a rescission or restitution measure of damages. Out-of-pocket damages, if properly measured, are restitution damages. *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007) (per curiam). Rescission is a type of remedy in a fraud claim, but it is not a proper remedy if the amount the plaintiff pays for the property is equal to

its value at the time the plaintiff purchased the property. *Bryant v. Vaughn,* 33 S.W.2d 729, 730 (Tex.1930) (holding that plaintiff had no right to rescind in fraud action where jury found that value of property received by plaintiff was equal to amount plaintiff paid for property); *see also Cruz v. Andrews Restoration, Inc.,* 364 S.W.3d 817, 823 (Tex.2012) ("[A] rescission award requires a showing of actual damages."); *Grundmeyer v. McFadin,* 537 S.W.2d 764, 769 (Tex.Civ.App.Tyler 1976, writ ref'd n.r.e.); *Tex. Indus. Trust, Inc. v. Lusk,* 312 S.W.2d 324, 327 (Tex.Civ.App.-San Antonio 1958, writ ref'd). A plaintiff seeking to rescind a transaction induced by fraud "must surrender any benefits received" in the transaction, as "rescission is not a one-way street. It requires a mutual restoration and accounting, in which each party restores property received from the other." *Cruz,* 364 S.W.3d at 824, 826 (citing *Tex. Emp'rs Ins. Ass'n v. Kennedy,* 135 Tex. 486, 143 S.W.2d 583, 585 (1940)).

■ Jury question 2(2) properly instructed the jury on out-of-pocket damages. In finding no out-of-pocket damages in response to that question, the jury found no restitution damages. *See Sonnichsen,* 221 S.W.3d at 636. The jury's finding of no actual damages—that the amount the Fazios paid for the property equaled the value of the property when the Fazios purchased it, and that the Fazios suffered no consequential damages—precludes a money judgment based on a rescission theory. *See Bryant,* 33 S.W.2d at 730; *Cruz,* 364 S.W.3d at 823. Pursuant to a proper measure of rescission damages, the Fazios would have to reduce any amount of damages by whatever benefit they received in the transaction. *See Cruz,* 364 S.W.3d at 824. As the jury found that the Fazios received property equal in value to what they paid for it, and that the fraud did not proximately cause money damages under a

proper measure, rescission is not a supportable remedy. *See id.* Question 2(1), in any event, does not ask about fraud-induced losses, albeit at a later time; rather, it asked the jury to mechanically subtract the price for which the Fazios sold the property three years later from the original purchase price. We hold that the trial court properly disregarded the jury's answer to question to 2(1), as it did not measure rescission or restitution damages. *Spencer,* 876 S.W.2d at 157 (holding that jury question is immaterial and jury's answer should be disregarded if question is legally improper).

### D. Exemplary Damages

■ Finally, because the jury found no direct or consequential damages, the Fazios could not recover exemplary damages. *See Wright v. Gifford–Hill & Co., Inc.,* 725 S.W.2d 712, 714 (Tex.1987) ("When a jury fails to find a plaintiff has sustained actual damages, the plaintiff is foreclosed from recovering exemplary damages."); *see also Sec. Inv. Co. of St. Louis v. Fin. Acceptance Corp.,* 474 S.W.2d 261, 270 (Tex.Civ. App.-Houston [1st Dist.] 1971, writ ref'd n.r.e.). The trial court therefore properly disregarded the jury's award of exemplary damages.

### Attorney's Fees

Cypress requested that the trial court award it attorney's fees pursuant to section 7.3 of the purchase agreement, which requires,

[i]n the event either party hereto is required to employ an attorney in connection with claims by one party against the other arising from the operation of this Agreement, the non-prevailing party shall pay the prevailing party all reasonable fees and expenses, including attorney's fees incurred in connection with such transaction.

The Fazios sued Cypress for common-law fraud, statutory fraud in a real estate transaction, and fraudulent inducement, but not for breach of contract. The trial court directed a verdict on the first two fraud claims, leaving the jury to decide only the fraudulent inducement claim. Cypress presented evidence that its attorney's fees through judgment in the trial court were $987,934.64 and its expenses were $53,703.58. The trial court denied Cypress's request for fees.

Although the Fazios' claims against Cypress sound in tort, Cypress contends that it may avail itself of the contractual remedy of attorney's fees, because the tort claims asserted against it should be read to "arise from the operation of the purchase agreement. The Fazios respond that Cypress reads the contract too broadly, and the provision at issue cannot require it to pay attorney's fees to a party defending against a tort claim that arose before the parties executed their agreement.

*Standard of review*

■ We review the trial court's construction of an unambiguous contract de novo. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–651 (Tex.1999). If a term is not defined by the parties, we use the term's plain, ordinary, and generally accepted meaning unless the instrument shows that the term has been used in a technical sense. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

*Analysis*

■ Cypress compares the prevailing party provision in the purchase agreement to prevailing party provisions in other agreements that provide for the recovery of attorney's fees in claims "related to" the agreement, which courts have interpreted

to permit recovery of attorney's fees in fraudulent inducement claims. *See Robbins v. Capozzi*, 100 S.W.3d 18, 26–27 (Tex. App.-Tyler 2002, no pet.) (holding party entitled to recover attorney's fees for successfully defending fraud and DTPA claims under contract provision for such fees when agreement allowed their recovery by "[t]he prevailing party in any legal proceeding brought under or with respect to the transaction described in his contract"); *Rich v. Olah*, 274 S.W.3d 878, 888 (Tex.App.-Dallas 2008, no pet.) (holding that fraud and DTPA tort claims related to contract for purpose of provision awarding attorney's fees when contract provided for recovery by "prevailing party in any legal proceeding related to this contract"). Other prevailing party provisions that do not use the "with respect to" or "related" language have been construed more narrowly. *See, e.g., Oat Note, Inc. v. Ampro Equities, Inc.*, 141 S.W.3d 274, 280–81 (Tex.App.-Austin 2004, no pet.) (holding that prevailing party in misrepresentation claim could not recover attorney's fees under provision allowing party to recover attorney's fees if it "prevails in any litigation to enforce this Contract"). The language in this agreement is somewhere between the more broadly worded "related to" or "with respect to" and the more narrow "to enforce".

"Arising from the operation" of an agreement is more limited than "related to" an agreement. "Arising" means to originate or stem from. BLACK'S LAW DICTIONARY 122 (9th ed. 2009). "Operation" refers to the act or process of functioning or performing or "being in or having force or effect." *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 869 (11th ed. 2003); BLACK'S LAW DICTIONARY 1201 (9th ed. 2009). Thus, "arising from the operation" of the agreement means originating from the performance of the agreement or the legal effect and obligations imposed by the agreement. *See, e.g., Pagel v. Pumphrey*, 204 S.W.2d 58, 64 (Tex.Civ.App.-San Antonio 1947, writ ref'd n.r.e.) (explaining that operation of agreement is its legal effect and obligations that it imposes on the parties); *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.*, 762 F.2d 1239, 1245 (5th Cir. 1985) (referring to contract's "operation" parties' performance of legal obligations imposed by contract). The language of section 7.3 of the purchase agreement more closely resembles the limited "to enforce" than the expansive "to relate."

The Fazios' claims are based on a failure to disclose information that Cypress promised to disclose before the parties ever entered into the purchase agreement. This is not a dispute about performance under the agreement or a suit for its breach. *See Formosa Plastics*, 960 S.W.2d at 47 ("[A]n independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement."). While a contract undoubtedly can affect the scope of a legal duty to not commit fraud and is essential in determining the measure of damages for fraudulent inducement, the tort itself in this instance does not arise from the contract's operation—it was a pre-contract tort to induce a sale. The parties did not choose to allow for recovery of fees incurred in defending against extra-contractual tort claims by including torts or claims more broadly "relating to" the agreement. We hold that the Fazios' claims against Cypress do not "arise from the operation" of the purchase agreement; hence, the trial court correctly ruled that Cypress is not entitled to attorney's fees for defending against these claims.

## Conclusion

The trial court properly entered a take-nothing judgment, because the jury found no actual damages under their correct

measurement. The trial court properly denied Cypress's request for attorney's fees, because the Fazios' fraud and fraudulent inducement claims arose from conduct that occurred before the purchase agreement's execution, and not from its operation, and the agreement's attorney's fees provision does not encompass torts or extra-contractual claims. We therefore affirm the judgment of the trial court.

Justice MASSENGALE, concurring.

Justice KEYES, joined by Justices JENNINGS, HIGLEY, and SHARP, dissenting.

Justice JENNINGS, joined by Justices KEYES, HIGLEY, and SHARP, dissenting from granting of en banc reconsideration.

MICHAEL MASSENGALE, Justice, concurring.

I join the en banc majority opinion. Because the disclaimer of reliance and merger principles at issue in this case have broad application in commercial contracts, I write separately to address the dissenters' erroneous analysis of the parties' disclaimer of reliance.[1] Although it was not necessary for the en banc majority to decide this issue to affirm the trial court's take-nothing judgment[2]—and the en banc majority did not decide the issue—it continues to be my opinion that it is an independent basis to affirm.[3]

This appeal arises from a $7.67 million real-estate transaction between experienced and sophisticated investors. The fully integrated written agreement for the purchase and sale of commercial property recited that the buyer would "rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's ... economic condition." The agreement also clearly and unequivocally expressed an intention to disclaim the buyer's reliance on the seller's representations—and omissions from representations—with respect to the economic condition of the property, and it disclaimed any seller liability to the purchaser with respect to such representations or omissions. The question is whether these contractual provisions should be enforced.

The dissenters would refuse to enforce this contract as written. I disagree, and would hold that the parties' disclaimer of reliance foreclosed any subsequent claim that the buyer was fraudulently induced to enter into the transaction.

## I. Effect of fully integrated purchase agreement

The parties' duties with respect to pre-transaction due diligence were expressly defined in the Purchase Agreement, which was a fully integrated contract. The no-

---

1. All of my quotations from and other references to the "dissent" are references to the principal dissenting opinion authored by Justice Keyes.

2. *See Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991) ("When the trial court states no reason why judgment n.o.v. was granted, and the motion for judgment n.o.v. presents multiple grounds upon which judgment n.o.v. should be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion."). Contrary to the dissent's implied assertion, *see* Dissent at 9, the trial court did not explicitly rule on the disclaimer-of-reliance issue. The trial court's December 22, 2008 order granting JNOV did not specify any particular substantive ground for the ruling.

3. *See Fazio v. Cypress/GR Houston I, L.P.,* No. 01–09–00728–CV, 2012 WL 3524842, at *30–*38 (Tex.App.-Houston [1st Dist.] Aug. 16, 2012) (Massengale, J., dissenting).

tion that the seller[4] breached duties of disclosure arising from provisions in the preliminary letter of intent is a flawed premise, because the LOI's terms were inconsistent with the final agreement. The due diligence terms of the LOI, including the provision that "[t]he Seller will provide Buyer with all information in their possession," did not become binding obligations of the seller upon the execution of the Purchase Agreement.

Instead, as the parties expressly contemplated at the time the LOI was executed, and as routinely occurs in such transactions,[5] the terms of the LOI were displaced by and replaced with the terms of the Purchase Agreement. That is the typical resulting effect on a preliminary letter of intent after the parties execute a subsequent, fully integrated contract. By executing the LOI, the parties acknowledged that the document was "an expression of understanding and intention only, and if accepted, will provide guidance for drafting a formal Purchase Agreement." The LOI specified that "Terms and conditions set forth in this proposal shall not be binding on both parties until and unless a formal Purchase Agreement is executed and delivered to both parties."

This language did not bind the parties to strict compliance with all provisions of the LOI before they could execute their negotiated Purchase Agreement. The entire thrust of the LOI is to the contrary, emphasizing the contingent, nonbinding nature of the parties' preliminary negotiating positions. The LOI was prepared in the form of a letter from Fazio, as buyer, to Cypress Equities, as seller. Each of the italicized terms in the following excerpts from the LOI confirms the parties' intention that the LOI was a preliminary and fundamentally nonbinding expression of the conditions under which they would

4. The "seller" identified in the LOI was Cypress Equities, and the "seller" identified in the Purchase Agreement was Cypress GR/Houston I, L.P. Although the jury found that these entities operated as a single business enterprise, the trial court granted the defendants' motion for JNOV and disregarded that finding. The dissenters' analysis would require that the jury finding concerning existence of a single business enterprise be reinstated, and their opinion treats all Cypress entities as if they were the same party. In the interest of simplicity, for purposes of my opinion I refer generally to the "seller" except to the extent specific points depend upon identification of the particular entity.

My analysis of the contracts at issue makes it unnecessary for me to also address the alter-ego issue to conclude that that the trial court's judgment should be affirmed. I nevertheless note my disagreement with the dissenters' conclusory analysis of that issue. *See* Dissent at 46–48. The dissenters note that various actions were taken by separate related entities, but they identify none of the kind of evidence relating to the relationship of the corporate entities necessary to justify piercing the corporate veil, nor does it analyze whether the entities' use of limited liability was illegitimate. *See SSP Partners v. Gladstrong Inves. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex.2009). Texas law presumes that separate corporations are distinct entities. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). Contrary to the entire thrust of the dissenters' discussion of this issue, an entity or person does not become jointly liable for a corporation's obligations "merely because they were part of a single business enterprise" or "merely because of centralized control, mutual purposes, and shared finances." *SSP Partners*, 275 S.W.3d at 452, 455.

5. *See, e.g., Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 699 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) (cited with approval in *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323, 334 n. 6 (Tex.2011)); *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 19 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) ("the basic concept of a letter of intent is to provide the parties with a way to structure their agreement without entering a binding contract").

continue to negotiate towards the possible result of a purchase and sale:

- Fazio wrote in the LOI that the letter "will confirm my interest in *negotiating with you* for the sale of your Property, referenced above, under the following terms and conditions." The reference to negotiations suggests an ongoing discussion about whether the parties will consummate a transaction.

- The LOI provided for no earnest money to be paid immediately by Fazio as buyer, but instead that an escrow deposit of $50,000 would be made only upon "*the execution of a formal Purchase Agreement.*" The escrow deposit would be increased to $100,000 and "*become non-refundable . . . upon the Buyer's written removal of all contingencies agreed to in the Purchase Agreement.*" This language confirms the preliminary status of the negotiations because an initial escrow deposit would not be required unless the parties advanced to the stage of executing a formal agreement, and the parties contemplated that even that agreement might be nonbinding in certain respects, as contingencies might remain such that the escrow might still be refundable to the buyer.

- With respect to anticipated due diligence, Fazio's letter proposed that he would have "30 days from the receipt of the . . . documents to investigate all aspects of the Property *to determine, in Buyer [sic] sole judgement, if it is acceptable.*" This term confirms that Fazio was not committed to buying the property, as he retained the right to exercise his "sole judgement" whether to proceed with the purchase.

- Finally, the LOI provided: "This *proposal* is an *expression of understanding and intention only,* and *if accepted,* will provide *guidance* for drafting a formal Purchase Agreement. Terms and conditions set forth in this proposal *shall not be binding* on both parties until and unless a formal Purchase Agreement is executed and delivered to both parties." This language confirms the preliminary and nonbinding nature of everything contained in the LOI. It expressly contemplated that a later, more formal agreement would be negotiated if the parties chose to proceed. It also contemplated that the ultimate terms of the Purchase Agreement would vary from the terms of the LOI, which would only provide "guidance" at that stage of the negotiation. Read in context of the entire LOI, the reference to its terms being nonbinding "until and unless a formal Purchase Agreement is executed" cannot be read reasonably to indicate that the parties could not continue to negotiate terms or that, upon doing so, the parties could not document their final understanding and binding agreement by including a merger clause that confirmed that the final agreement superseded all prior oral and written agreements.

To recapitulate, the LOI referenced anticipated continuing negotiations, the contingent nature of the parties' "expression of understanding and intention," and the buyer's continuing freedom to decide whether the property is acceptable. All terms were expressly declared to be nonbinding, and there was no indication that any specific term was intended to survive the negotiations and ultimate execution of the Purchase Agreement.

Consistent with expectations as articulated in the LOI, that nonbinding agreement was mooted when Fazio and Cypress GR/Houston I, L.P. entered into an integrated agreement containing the following merger clause:

Section 11.1  *Entire Agreement.*

> This Agreement contains the entire agreement of the parties hereto. There are no other agreements, oral or written, and this Agreement can be amended only by written agreement signed by the parties hereto, and by reference, made a part hereof.

This provision declared the intention that the Purchase Agreement constituted "the entire agreement of the parties," indicating that the contract was a completely integrated agreement and not one of multiple agreements addressing multiple aspects of a transaction or the relationship between the parties.[6]  One effect of a merger clause in this circumstance is to invoke the substantive doctrine of the parol evidence rule, such that all prior negotiations and agreements with regard to the same subject matter are excluded from consideration, whether they were oral or written. *See, e.g., Edascio, L.L.C. v. NextiraOne L.L.C.,* 264 S.W.3d 786, 796 (Tex. App.-Houston [1st Dist.] 2008, pet. denied); *Ledig v. Duke Energy Corp.,* 193 S.W.3d 167, 178 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Baroid Equip., Inc. v. Odeco Drilling, Inc.,* 184 S.W.3d 1, 13 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 215 (1981). "The rule is particularly applicable when the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision." *Baroid Equip.,* 184 S.W.3d at 13.  Thus, even to the extent that—in an appropriate case—the LOI might be considered as evidence in order to establish an allegation of fraud, it cannot be used as a bootstrap merely to establish the existence of a separate and inconsistent contractual duty. "[T]he mere failure to perform a contract is not evidence of fraud." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998).  Accordingly, the seller's contractual disclosure obligations in this case were not contained in the LOI, but instead were exclusively contained in the Purchase Agreement itself.

When the parties did execute a formal and fully integrated Purchase Agreement, they did not adopt the due diligence provisions of the LOI, but instead agreed to a much more detailed "Inspection" provision, contained in Article V of the Agreement. Thus the parties' only agreement as it pertains to the seller's disclosure obligations is contained in the Purchase Agreement, and not in the LOI.

## II.  Enforceability of waiver of liability and disclaimer of reliance

Divorcing the terms of the LOI from the analysis and focusing solely upon the terms of the Purchase Agreement, that contract waives any liability for omissions from the seller's communications to the buyer, and it includes a clear and unequivocal expression of intent to disclaim the buyer's reliance on the completeness of the documentation provided to it by the seller. Article V of the Purchase Agreement contains the parties' agreement about the parameters of the buyer's opportunity to perform due diligence.  Section 5.1 is entitled

---

**6.**  Notably, to the extent that Fazio actually contracted with different entities when executing the LOI and the Purchase Agreement (and not the same entity in both instances), by its own terms the Purchase Agreement's merger clause would not integrate and supersede Fazio's agreement with Cypress Equities, which was not a party to the Purchase Agreement.  Nevertheless, that nuance provides no relief to Fazio.  Assuming that he dealt with different entities when entering into the two agreements, then he cannot rely on the LOI with Cypress Equities to impose a contractual duty to disclose on Cypress GR/Houston I, L.P.

"Inspection Period," and it provides for a 30–day period, commencing on the "Effective Date," during which time the buyer was afforded reasonable opportunities to enter and inspect the property. During the first 10 days of the Inspection Period, the seller was required to deliver a group of "Documents" to the purchaser, as defined in section 5.2, which is devoted to describing and limiting the seller's disclosure obligations.

To understand the flaw in the dissenters' interpretation of section 5.2, it is helpful to set out that provision in its entirety before examining the critical component parts:

Section 5.2 *Document Review.*

(a) *Documents.* Within ten (10) days after the Effective Date, Seller shall deliver to Purchaser the following, if in the possession of Seller (collectively, the **"Documents"**):

(i) copies of the Lease and all amendments thereto;

(ii) the Survey;

(iii) copies of any Plans;

(iv) to the extent allowed by the author, copies of all existing soil, engineering, architectural, and environmental reports covering the Property in Seller's possession;

(v) copies of all Service Contracts, if any; and

(vi) copies of all Permits.

(b) *Proprietary Information.* Purchaser acknowledges that any and all of the Documents are proprietary and confidential in nature and will be delivered to Purchaser solely to assist Purchaser in determining the feasibility of purchasing the Property. Purchaser agrees not to disclose the contents of the Documents to any party outside of Purchaser's organization except to its attorneys, accountants, lenders, or investors (collectively, the **"Permitted Outside Parties"**). Purchaser further agrees that the Documents shall be disclosed and exhibited only to those persons within Purchaser's organization or to those Permitted Outside Parties who are responsible for determining the feasibility of Purchaser's acquisition of the Property and who have agreed in writing to preserve the confidentiality of such information as required herein. In permitting the Permitted Outside Parties to review the Documents or other information to assist Purchaser, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created by Seller and any such claims are expressly rejected by Seller and waived by Purchaser and the Permitted Outside Parties, for whom, by its execution of this Agreement, Purchaser is acting as an agent with regard to such waiver.

(c) *Return of Documents.* Purchaser shall return all of the Documents, any and all copies Purchaser has made of the Documents, and all copies of any studies, reports, or test results obtained by Purchaser in connection with its inspection of the Property (collectively, the **"Purchaser's Information"**) within five (5) business days following such time as this Agreement is terminated for any reason. This provision shall survive the termination of this Agreement.

(d) *No Representation or Warranty by Seller.* Purchaser hereby acknowledges that, except as otherwise specifically set forth in this Agreement, Seller has not made and does not

make any warranty or representation regarding the truth, accuracy, or completeness of the Documents or the source(s) thereof, and that Seller has not undertaken any independent investigation as to the truth, accuracy, or completeness of the Documents and is providing the Documents solely as an accommodation to Purchaser. Except with respect to any express warranties made in this Agreement, Seller expressly disclaims and, Purchaser waives any and all liability for representations or warranties, express or implied, statements of fact, and other matters contained in the Documents, or for any omissions from the Documents, or in any other written or oral communications transmitted or made available to Purchaser. Except with respect to any express warranties made in this Agreement, Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's physical, environmental, or economic condition, compliance or lack of compliance with any ordinance, order, permit, or regulation or any other attribute or matter relating thereto.

The "Documents" to be disclosed pursuant to section 5.2(a) were "copies of the Lease and all amendments thereto," "the Survey," "copies of any Plans," "to the extent allowed by the author, copies of all existing soil, engineering, architectural, and environmental reports covering the Property in Seller's possession," "copies of all Service Contracts, if any," and "copies of all Permits." [7] Section 5.2(b) and (c)

included provisions for the treatment of proprietary information within the "Documents" and for the return of all "Documents" in the event the Purchase Agreement was terminated.

**A. Disclaimer and waiver of liability for omissions**

Importantly, section 5.2(d) is entitled *"No Representation or Warranty by Seller."* In it, the buyer acknowledged:

> ... [E]xcept as otherwise specifically set forth in this Agreement, Seller has not made and does not make any warranty or representation regarding the truth, accuracy, or completeness of, the Documents or the source(s) thereof, and that Seller has not undertaken any independent investigation as to the truth, accuracy, or completeness of the Documents and is providing the Documents solely as an accommodation to Purchaser....

The foregoing language did not affirmatively authorize the seller to misrepresent the truth or to knowingly conceal information, but it could reflect the parties' intention to limit the scope of the seller's obligations to search for and investigate the "Documents" to be provided by the seller. More critically, the following sentence provided:

> ... Except with respect to any express warranties made in this Agreement, Seller expressly disclaims and Purchaser waives any and all liability for representations or warranties, express or implied, statements of fact, and other matters contained in the Documents, or for any omissions from the Documents, or in any other written or oral communications transmitted or made available to Purchaser....

---

7. The inclusion of the lease and all service contracts as part of the "Documents" demonstrates that the category was not limited to items "which dealt with the condition of the Property," nor do the "Documents" entirely exclude items relating to "the economics of the purchase transaction."

This sentence expressly addressed the seller's "liability" in connection with providing the "Documents." It clearly and unequivocally provided that the seller "expressly disclaims"—and that the buyer "waives"—"any and all liability" for effectively everything "contained in the Documents."[8] And beyond the information affirmatively provided by disclosing the "Documents," the express disclaimer and waiver of liability also extended to "any omissions" from information that was provided, regardless of whether it should have been disclosed as part of the "Documents." That same seller's disclaimer of liability and buyer's waiver of liability extended to "any omissions . . . in any other written or oral communications transmitted or made available to Purchaser."

Plain English and its rules of grammar confirm that this disclaimer and waiver of liability extended to omissions from the seller's communications to the buyer.[9] The phrase "in any other written or oral communications transmitted or made available to Purchaser" properly can be read only as a modification of "omissions." The only other conceivable function of that phrase in the sentence would be to modify the reference to "liability," but that reading would require the implausible assumption that the contract was drafted to disclaim and waive "liability . . . *in* any other written or oral communications transmitted or made available to Purchaser." (Emphasis supplied.) One does not ordinarily speak of liability "in" a matter, but of liability "for" something. The natural

and correct reading of the contract language is that liability is disclaimed and waived "*for* any omissions . . . *in* any other written or oral communications transmitted or made available to Purchaser." (Emphasis supplied.) Section 5.2(d)'s reference to "omissions" thus cannot be read, as the dissenters read it, *see* Dissent at 24–25, as if it were limited to "omissions from the Documents" and did not also embrace "omissions . . . in any other written or oral communications transmitted or made available to Purchaser."

Tellingly, the dissenters have failed to respond to the merits of this grammatical analysis, nor have they offered any other interpretation of the disclaimer as it relates to "omissions . . . in any other written or oral communications transmitted or made available to Purchaser."

**B. Buyer's sole reliance on his own investigation and purchase of property "as is"**

Consistent with the aforementioned provisions immunizing the seller from liability for errors or omissions in communications to the buyer, section 5.2(d) concluded by affirming that the buyer was accepting responsibility for developing the information necessary to satisfy itself about the property it was buying:

> Except with respect to any express warranties made in this Agreement, Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the

---

8. As phrased in the Purchase Agreement, the matters "contained in the Documents" for which the "Seller expressly disclaims and the buyer waives any and all liability" are described as: (a) "representations or warranties, express or implied," (b) "statements of fact," and (c) "other matters contained" therein.

9. *See, e.g., Gen. Fin. Servs., Inc. v. Practice Place, Inc.,* 897 S.W.2d 516, 522 (Tex.App.-Fort Worth 1995, no writ) ("Courts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction."); *Porter v. Milner,* 352 S.W.2d 787, 789 (Tex.Civ.App.-Fort Worth 1961, no writ) ("Rules of grammar underlie all legal rules applicable in the construction of contracts.").

Property's physical, environmental, or economic condition, compliance or lack of compliance with any ordinance, order, permit, or regulation or any other attribute or matter relating thereto.

The buyer's specific affirmation that it was relying solely upon its own investigation, and the parties' deliberate intent to foreclose liability for both the seller's affirmative communications to the buyer and omissions therefrom, are further confirmed by the Purchase Agreement's inclusion of an "as-is" provision in section 5.5, which provided, in relevant part:

*Property Conveyed "AS IS".*

(a) EXCEPT AS OTHERWISE PROVIDED HEREIN OR IN THE DEED ... (2) PURCHASER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT (A) PURCHASER HAS OR WILL HAVE, PRIOR TO THE END OF THE INSPECTION PERIOD, THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE PURCHASE OF THE PROPERTY AND (B) PURCHASER IS RELYING SOLELY UPON SUCH INSPECTIONS, EXAMINATIONS, AND EVALUATION OF THE PROPERTY BY PURCHASER IN PURCHASING THE PROPERTY ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE.

. . . .

Fazio's willingness to execute the Purchase Agreement, with its disclaimers, cannot be explained by his supposed expectation that the seller had provided "every scrap of paper" in its possession relating to the property. Dissent at 17. Such an expectation would not be reasonable under the terms of the fully integrated Purchase Agreement. A far more plausible inference would be that if a buyer were in fact relying upon a belief that the seller had disclosed "every scrap of paper" to him, such a buyer would not have agreed to a provision stating that it "shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's ... economic condition." A sophisticated real-estate purchaser could be expected to memorialize such an understanding in section 8.2 of the Purchase Agreement, which contained "Seller's Representations and Warranties." Fazio didn't.

### C. Application of *Schlumberger, Forest Oil,* and *Italian Cowboy*

Contrary to the dissenters' view, the Texas Supreme Court's recent *Italian Cowboy* opinion did not address circumstances "similar" to those in this case. Dissent at 14. The language relied upon in *Italian Cowboy* as a purported disclaimer of reliance provided: "Tenant acknowledges that neither Landlord nor Landlord's agents, employees, or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.,* 341 S.W.3d 323, 328 (Tex.2011). The Court compared this language to the provisions found to be effective disclaimers of reliance in *Schlumberger*[10] and *Forest Oil,*[11]

---

**10.** The *Italian Cowboy* opinion quoted and relied upon the following language from the settlement agreement at issue in *Schlumberger*

and concluded that the lease language at issue in the case did not include clear and unequivocal language expressly disclaiming reliance on representations and affirming reliance on one's own judgment. *See id.* at 336. Instead, the *Italian Cowboy* Court found the language at issue to indicate "nothing more than the provisions of a standard merger clause," which is not sufficient to indicate an intent to disclaim reliance. *Id.* at 334. In other words, it is a misunderstanding of *Italian Cowboy* to suggest that the Supreme Court allowed a claim of fraudulent inducement to proceed despite a disclaimer of reliance. *See* Dissent at 15–16. The critical distinguishing factor in *Italian Cowboy* was the absence of a disclaimer of reliance.

This case is distinguishable from *Italian Cowboy* in at least two respects. The Purchase Agreement uses the term "rely" in providing that the "Purchaser shall *rely* solely upon its own investigation with respect to the Property." (Emphasis sup-

plied.) "Rely" is also used in the "as-is" clause, in which the buyer affirmed it was "RELYING SOLELY UPON SUCH INSPECTIONS, EXAMINATIONS, AND EVALUATION OF THE PROPERTY" as it deemed necessary to enable its évaluation of the transaction.[12] This factor was expressly noted in *Italian Cowboy* to distinguish that case from *Schlumberger* and *Forest Oil,* both of which featured contracts using the term "rely" to clearly and unequivocally indicate a party's intent to rely on its own judgment. *See Italian Cowboy,* 341 S.W.3d at 336. Second, the key language at issue cannot be characterized as merely echoing the intent and purpose of a merger clause. Rather, the language specifically references "liability" arising from representations or omissions from documents or other written or oral communications, and it clearly and unequivocally provides that the seller disclaims and that the buyer waives "any and all" liability of that nature.[13]

---

Tech. Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997):

> [E]ach of us ... expressly warrants and represents ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that none of us is *relying* upon any statement or representation of any agent of the parties being released hereby. Each of us is *relying* on his or her own judgment....

Italian Cowboy, 341 S.W.3d at 336 (quoting Schlumberger, 959 S.W.2d at 180 (emphasis added in Italian Cowboy)).

11. The opinion quoted and relied upon the following language from the settlement agreement at issue in Forest Oil Corp. v. McAllen, 268 S.W.3d 51 (Tex.2008):

> [We] expressly represent and warrant ... that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not *relying* upon any statement or representation of any of the parties being released hereby. [We] are *relying* upon [our] own judgment....

Italian Cowboy, 341 S.W.3d at 336 (quoting Forest Oil, 268 S.W.3d at 54 (emphasis added in Italian Cowboy)).

12. The presence of the "as-is" clause also precludes the buyer from asserting that he was fraudulently induced to enter into the transaction by the seller's breach of a common-law duty to disclose information about the property. This clause affirmed the buyer's opportunity to fully inspect to the extent he deemed necessary, as well his sole reliance upon his own inspections. Such affirmations and agreements between sophisticated parties of relatively equal bargaining position should be given effect. See Prudential Ins. Co. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 162 (Tex.1995).

13. The seller's "one-sided knowledge of past facts" as referenced in Italian Cowboy and by the dissenters, see Dissent at 14, had nothing to do with why that case was distinguishable from Schlumberger and Forest Oil. Italian Cowboy thus does not support a conclusion in this case that "Cypress's superior knowledge of past facts ... made Cypress's suppression

The buyer-plaintiffs' claims in this case arise from their allegation that the seller-defendants failed to disclose information about economic risks to the property owner, i.e., the financial condition of the property's tenant and the tenant's requests for rent relief, facts which affected the value of the income stream expected from renting the property to that tenant. The dissenters studiously ignore the Purchase Agreement's specific reference to the Property's "economic condition" as one of the aspects of the transaction for which the buyer was relying "solely upon its own investigation." I would hold that the Purchase Agreement's express disclaimer and waiver of seller liability arising from representations or omissions in the parties' communications leading up to the closing of the transaction, combined with the acknowledgement that "Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's ... economic condition," constitutes clear, specific, and unequivocal disclaimer of reliance sufficient to preclude this subsequent claim of fraudulent inducement. *See Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 61 (Tex. 2008); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 179 (Tex.1997).

### D. Enforceability of disclaimer

The question remains, however, whether the disclaimer is binding in light of the totality of circumstances surrounding this contract. *See Forest Oil,* 268 S.W.3d at 61; *Schlumberger,* 959 S.W.2d at 179. This is a legal question which we review de novo. *Forest Oil,* 268 S.W.3d at 55. The factors that guided the Supreme Court's reasoning in *Schlumberger* and *Forest Oil* included:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

*Id.* at 60. The Fazios do not dispute that this was an arm's-length transaction. As explained above, the language disclaiming reliance and waiving liability based upon seller representations was clear.

The other aspects of this transaction also support enforcing the agreement as written. Fazio is an experienced and sophisticated real estate investor. This was a $7,667,000 commercial transaction. The agreement was not presented to Fazio as non-negotiable boilerplate—in fact, he requested changes, including a change to delete any reference to him having the agreement reviewed by legal counsel. He similarly could have requested deletion of all or part of section 5.2(d) and 5.5.[14] Moreover, Fazio's request to remove a reference to his use of counsel demonstrated not only that he had the opportunity to review and negotiate the language of the contract, but also that his choice to forego the assistance of counsel was deliberate.

---

of information ... actionable under the circumstances." Dissent at 17–18. That conclusion can only be reached by disregarding the legal effect of a disclaimer of reliance by a sophisticated purchaser in a commercial real estate transaction.

**14.** *See Prudential Ins.,* 896 S.W.2d at 161 (noting that instead of agreeing to buy property "as is," a buyer "could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect," and further noting that "[i]f the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation").

It is undisputed that Fazio had ample resources to consult counsel. He routinely employed the professional assistance of real estate brokers, but he chose not to employ the professional assistance of legal counsel. Under such circumstances, he assumed the risk of proceeding without counsel, and his choice in that regard should not excuse him from being bound to the terms of his contract.

Unlike *Schlumberger* and *Forest Oil*, both of which involved settlement agreements, a final resolution of all disputes among the parties is not a factor informing the overall circumstances of this real estate transaction. And the record does not reflect specific negotiations about the provision at issue. Nevertheless, I would hold that, on balance, these factors are outweighed by the clear language of the contract, the arm's-length nature of the transaction, the experience and sophistication of the parties, the magnitude of the transaction, and the complaining party's deliberate choice to forego the assistance of legal counsel despite manifest opportunity and ability to have the assistance of an attorney.

Accordingly, as a separate and independent ground for affirming the trial court's rendition of judgment notwithstanding the verdict, I would hold that the buyers disclaimed reliance on the completeness of seller's disclosures and affirmatively waived any subsequent claim of fraudulent inducement to enter into the transaction.

TERRY JENNINGS, Justice,
dissenting from the granting of en banc reconsideration.

For over one-hundred and fifty years, Texas has recognized that in fraud cases "[r]escission is an equitable remedy and, as a general rule, the measure of damage is *the return of the consideration paid, together with* such further special damage or expense as may have been reasonably incurred by the party wronged ...." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 345 (Tex. 2011) (quoting *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 660 (Tex. 1979)). In *Wintz v. Morrison*, the Texas Supreme Court explained:

> Where one sells a herd of horses which he knows to be infected ... and *conceals the disease from the buyer*, who buys in ignorance of the disease and for a sound price, the buyer may claim a rescission of the contract, ... or, *without demanding a rescission ...*, the buyer may claim damages equivalent to the value of such as have died, *and the difference between the present value of the living and the price paid for them*, with interest on said sums from the date of sale; and also the value of the care, attention and expense of the buyer in preserving the herd.

17 Tex. 372, 373 (1856) (emphasis added).

The reason that such damages are allowed in fraud cases is that "on a rescission of a contract the contract is avoided ab initio," and the wronged party is entitled to be returned to its position "as if no contract had ever been made." *Hunt Cnty. Oil Co. v. Scott*, 28 Tex.Civ.App. 213, 67 S.W. 451, 452 (Tex.Civ.App.1902, writ ref'd). In short, "[c]omplete and full justice is a fundamental doctrine of equity jurisprudence, and if damages, as well as rescission, are essential to accomplish full justice, they will both be allowed." *Holland v. W. Bank & Trust Co.*, 56 Tex.Civ. App. 324, 118 S.W. 218, 218 (Tex.Civ.App. 1909, no writ).

The panel majority, fully understanding the above fundamental legal principles, held that appellant, Peter Fazio, is entitled to be restored to his position as if he had not entered into a contract to purchase real property from appellees, Cypress/GR

Houston I, L.P., Cypress/GR Houston, Inc., and Cypress Equities, Inc. (collectively, "Cypress"). The panel majority based its holding on the jury's unanimous finding, from clear and convincing evidence, that Cypress committed fraud against Fazio in selling him the property and "the harm to Fazio resulted from [the] fraud." In regard to ascertaining what sum of money "would fairly and reasonably compensate" Fazio for his fraud-based damages, the trial court asked the jury to determine (1) the "difference between the price the Fazios paid for the Property and the amount they received when they sold the Property" and (2) the "difference, if any, between the price the Fazios paid for the Property and the value of the Property at the time" the parties executed the purchase agreement.

As noted by the en banc majority, the jury's fraud finding is based on the fact that Cypress withheld certain material information from Fazio regarding the financial condition of the property's primary tenant, Garden Ridge. Fazio purchased the property on October 31, 2003, and Garden Ridge made its rental payments in November and December. However, its January 2004 rental check bounced, and it declared bankruptcy in February 2004. Although Fazio attempted to re-lease the property, he was unable to do so and had to sell it, incurring a substantial loss. Thus, the jury could have reasonably inferred that Cypress, which had material information that Garden Ridge was in such serious financial distress that it was "restructuring" and "needed to reduce [its] occupancy costs at your premises," unloaded the property onto Fazio so it would not incur the loss that he ultimately sustained when Garden Ridge did, in fact, default. When Garden Ridge defaulted, less than three months after Fazio purchased the property, the property lost what Cypress had represented to him as "currently reported absolute net income of $805,040."

Accordingly, as noted by the panel majority, in order to restore Fazio to the position he held prior to becoming a victim of Cypress's fraud, the trial court, as a matter of law, should have awarded him $3,961,524.60, which, as the jury found as a matter of simple arithmetic, is the "difference between the price the Fazios paid for the Property and the amount they received when they sold the Property." *See Wintz,* 17 Tex. at 373 (explaining fraud victim entitled to recover the difference between the price paid for diseased horses and "the present value of the living" horses "with interest on said sums from the date of sale."). Such an award would have restored to Fazio the consideration that he paid for the property, with Cypress keeping the remaining $3,705,475.40 that Fazio paid to it. To the extent that the trial court disregarded the jury's finding and entered its take-nothing judgment against Fazio, the panel majority correctly held that the trial court erred.

Based on the facts of this case, the difference between the price the Fazios paid for the property and its value at the time of purchase, prior to Garden Ridge's default, simply would not have restored Fazio to his position prior to becoming a fraud victim. Although the property may have been worth what he paid for it at the time he entered the contract, Fazio simply would not have entered into the contract had he known the specific material information about Garden Ridge's upcoming "restructuring" that Cypress wrongfully withheld from him. In short, he would not have purchased the property had he known, as did Cypress, that its primary tenant was about to default and, consequently, the property would lose its "currently reported absolute net income of

$805,040" and the value of the property would drop drastically.

In support of its assertion that the "only" appropriate measure of damages in this case is the difference between what Fazio paid for the property and the actual value of the property "at the time of sale," Cypress relies on *Arthur Andersen & Company v. Perry Equipment Corporation*, 945 S.W.2d 812, 817 (Tex.1997). However, as expressly noted by the Texas Supreme Court, the plaintiff in *Arthur Andersen*, an accounting-malpractice case, actually *elected not to recover on its fraud claim*, but rather on its claim for misrepresentation under the Texas Deceptive Trade Practices Act. *Id.* at 814; *see* TEX. BUS. & COM.CODE ANN. § 17.46(b) (Vernon 2011). The court noted that "direct damages for misrepresentation" are measured in "two ways," both determined "at the time of sale." *Id.* at 817. But it further explained that the plaintiff was also entitled to recover for losses "attributable to subsequent events" for which the defendant "should bear legal responsibility" and that such

> [s]ubsequent losses ... *are recoverable only if the misrepresentation is a producing cause of the loss* .... Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known. But to allow the plaintiff to transfer the entire risk of loss associated with his investment, *even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant,* would unfairly transform the defendant into an insurer of the plaintiff's entire investment.

*Id.* (emphasis added) (citations omitted). Because the plaintiff did not establish "how much of its loss occurred at the time of the sale" and "how much was attributable to subsequent events for which Arthur Andersen should bear legal responsibility," the court remanded the case for a new trial. *Id.* It did so because the plaintiff did present "evidence that Arthur Andersen's misrepresentation was a producing cause of [the plaintiff's] loss." *Id.*

In the instant case, Fazio is entitled to recover for his subsequent losses because there is evidence that but for Cypress's withholding of specific critical information from Fazio about Garden Ridge's upcoming "restructuring," he simply would not have incurred the risk of buying the property. And the jury's finding that the "difference between the price the Fazios paid for the Property and the amount they received when they sold the Property" was $3,961,524.60 reflects the loss that Fazio ultimately sustained as a result of Cypress's fraud. Thus, Cypress's reliance on *Arthur Andersen* is misplaced. And, more important, the supreme court in *Arthur Andersen* did not address fraud remedies and said nothing inconsistent with its well-established precedent regarding the right of a fraud victim to seek rescission and/or recovery of his consideration.

Regardless, the en banc majority has voted to overrule the panel's holding on damages. En banc consideration should be rarely granted, and it is "disfavored":

> *En Banc Consideration Disfavored.* En banc consideration of a case is not favored and should not be ordered *unless necessary* to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration.

TEX.R.APP. P. 41.2(c) (emphasis added). Here, the panel majority's opinion, which

was in accord with over one-hundred and fifty years of Texas law, did not conflict with any prior precedent of this Court. Nor did the panel majority commit any error of such magnitude that it amounted to an "extraordinary circumstance" requiring en banc review.

Rather, it appears that the en banc majority simply disagrees with the panel majority's original holding on the appropriate measure of damages. But this simple disagreement does not meet the high en banc standard:

> The standard for en banc consideration is not whether a majority of the en banc court may disagree with all or a part of a panel opinion. Neither is an assertion that an issue is "important" sufficient. Rather, when there is no conflict among panel decisions, the existence of "extraordinary circumstances" is required before en banc consideration may be ordered.

*Thompson v. State*, 89 S.W.3d 843, 856 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd) (Jennings, J., concurring in denial of en banc consideration). And, of course, an intermediate appellate court, sitting en banc, should never overrule a panel decision that simply corrects a trial court's error.

In sum, the panel majority, in accord with well-established precedent, simply corrected a trial court error, rendered the judgment the trial court should have rendered, and, in doing so, accorded Fazio complete and full justice. The en banc majority has erred in granting en banc consideration and undoing the panel majority's true and correct judgment. Accordingly, I respectfully dissent from the granting of en banc consideration.

1. Cypress/GR Houston, Inc. is the general partner of Cypress/GR Houston I, L.P. According to Cypress, Cypress Equities, Inc., is a real estate advisory firm.

**EVELYN V. KEYES, Justice,** dissenting on en banc reconsideration.

This is an appeal from a judgment notwithstanding the verdict ("JNOV"). Appellants, Peter Fazio, Shari Fazio, and Eric Fazio (collectively, "Fazio") sued appellees, Cypress/GR Houston I, L.P., Cypress/GR Houston, Inc., and Cypress Equities, Inc. (collectively, "Cypress")[1] for fraud and fraudulent inducement relating to a purchase agreement (the "Purchase Agreement") for approximately nine acres of retail property with improvements consisting mainly of a Garden Ridge store (the "Property" or "the Garden Ridge store"). Fazio alleged that Cypress, as the seller, concealed material information about the financial condition of the Garden Ridge store that it was required to produce to Fazio, the buyer, prior to the sale under the terms of a letter of intent (the "Letter of Intent" or "LOI") signed by both parties. A jury found that Cypress's concealment of financial information in its possession that was material to the sale fraudulently induced Fazio to purchase the Garden Ridge store. It awarded actual and exemplary damages to restore Fazio to the position he had been in prior to his purchase of the Property and to punish Cypress for its wrongful acts.

Cypress moved for JNOV, arguing that Fazio's fraud claims were barred by a contractual disclaimer of reliance in the Purchase Agreement in light of *Schlumberger Technology Corp. v. Swanson* and its progeny.[2] Cypress argued that, therefore, the jury's answer to Question No. 1(A), finding that Cypress committed fraud against Fazio, should be disregarded. It contended that it owed no duty to disclose

2. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex.1997).

information to Fazio and that the Letter of Intent could not create a duty as a matter of law. It further argued that, even if a duty of disclosure existed, the disclaimer of reliance clause in the Purchase Agreement negated the essential element of Fazio's reliance on Cypress's representations as a matter of law.

In addition, Cypress argued that the jury's damages finding in response to Question 2(1), awarding Fazio the difference between the price he paid for the Property and the price he sold it for, should be disregarded because, when the jury's answer to Question 1(A), finding fraud, is set aside, the answer to Question 2(1), finding damages for fraud, is rendered immaterial. Cypress also argued that the jury's answer that Cypress owed Fazio damages was immaterial because "Question No. 2(1) did not instruct the jury as to any recoverable measure of fraud damages under Texas law," and the question "erroneously instructed the jury as to an improper measure of damages because it asked the jury to measure the difference in the value of the Property between the date of purchase and the date of sale, four years later," whereas Texas law requires that fraud damages be measured at the time of the alleged fraudulent transaction. In sum, Cypress argued that the jury's answer to Question 2(1) was immaterial and must be disregarded because the measure of damages given to the jury was improper. Finally, Cypress argued that the jury's answer to Question 2(1) was immaterial because the jury found under a second damages question, Question 2(2), "that Fazio suffered no damages under the legally proper measure of damages, which must be measured at the time of the challenged transaction."

The trial court entered JNOV in response to Cypress's motion and ordered that Fazio take nothing by his claims.

The court also denied Cypress/GR Houston I's motion for attorney's fees. Fazio appeals the JNOV, and Cypress/GR Houston I also appeals, seeking its attorney's fees.

A panel of this Court reversed the trial court's JNOV. The panel majority concluded that Cypress was required by the terms of the Letter of Intent to produce all material information in its possession to Fazio prior to his purchase of the Property and that there was evidence to support the jury's finding in response to Question 1(A) that Cypress intentionally concealed material financial information, thus inducing Fazio to enter an agreement to purchase the Garden Ridge store that he would not have entered but for Cypress's misrepresentations and omissions. The panel majority further found that Fazio's fraud claims were not barred by the disclaimer of reliance in the Purchase Agreement and that, in response to Question 2(1), the jury properly awarded Fazio restitution damages as measured by the difference between the amount he paid for the Property and the amount for which he was able to sell it. Cypress moved for rehearing and en banc reconsideration of the panel's August 16, 2012 opinion. This Court voted to reconsider the case en banc. The majority of the en banc Court now affirms the JNOV on the ground that the trial court properly entered a take-nothing judgment in Cypress's favor. I respectfully dissent.

As Cypress admitted in its motion for JNOV, in order to reach the issue of whether the jury's verdict on damages should be set aside, the trial court had to determine whether Fazio was entitled to damages at all based on Cypress's misrepresentations and concealment of information. The en banc majority, however, fails to address this issue. I cannot agree with its decision to affirm the JNOV on the measure of damages without first deter-

mining whether the JNOV should be reversed for overturning the jury's finding that Cypress was liable for fraud—a conclusion the en banc majority necessarily reached in order to reach the damages issue but omitted from its opinion.

The only proper actions for this reviewing Court are (1) to agree with Cypress and the trial judge that the disclaimer of reliance in the Purchase Agreement barred Fazio's fraud claims based on concealment of material information prior to the closing date of the sale transaction and thus to affirm the JNOV or (2) to agree with the jury that Fazio's fraud claims were *not* barred but that there was no evidence under any measure that Fazio was harmed. Instead, the en banc majority determines that Fazio was awarded damages under an incorrect measure of damages. Because it concludes that the measure of damages submitted to the jury in Question 2(1) was incorrect, it should have remanded for entry of a proper amount of damages. This Court has no authority to overturn the damages award and to declare that Fazio take nothing so long as there is more than a scintilla of evidence to support Fazio's claim that Cypress concealed or misrepresented information material to Fazio's purchase of the Garden Ridge store that it was required to disclose and caused Fazio harm.

I would hold that Fazio's fraud claims based on Cypress's duty of disclosure prior to the sale were not barred as a matter of law by the disclaimer of reliance in the subsequently executed Purchase Agreement. Therefore, the trial court erred in granting JNOV on that ground, to the extent it did. I would further hold that there was more than a scintilla of evidence to support the jury's finding in response to Question 1(A) that Cypress defrauded Fazio by inducing him to execute the Purchase Agreement through the concealment and misrepresentation of material financial information. Finally, I would hold that the jury properly found, in response to Question 2(1), that Fazio was entitled to restitution damages for Cypress's fraud. I would, therefore, render judgment reinstating the jury verdict awarding Fazio $3,961,524.60 in damages for the fraud.

## Propriety of JNOV

Cypress argued in its motion for JNOV, which the trial court granted, that questions on fraud should never have been submitted to the jury because (1) it did not withhold material information from Fazio that it had a duty to disclose and (2) Fazio's fraud claims were barred as a matter of law by the disclaimer of reliance clause in the Purchase Agreement, and, thus, there was no evidence to support the jury's verdict as a matter of law.

In his first issue, Fazio argues that the trial court erred in disregarding the jury's answers to Question 1, finding that Cypress Equities defrauded him. He contends that the evidence was sufficient to establish that Cypress, as seller of the Property, had a duty as a matter of law to disclose material information to him; Cypress failed to disclose information material to the purchase; he was unaware that the material information was omitted; Cypress knew he was unaware of that information; and Cypress's conduct caused him harm. In his second issue, Fazio argues that his fraudulent inducement claim was not negated by the disclaimer of reliance, merger clause, or "as is" clause contained in the Purchase Agreement. I address these issues together.

### A. Standard of Review of JNOV

A trial court may disregard a jury finding and render JNOV if a directed verdict would have been proper, if the finding is immaterial, or if there is no evidence to

support one or more of the jury findings on issues necessary to liability. *See* Tex.R. Civ. P. 301; *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003); *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994); *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). A question is immaterial, for the purpose of determining whether a court may disregard a jury finding, when the question should not have been submitted, when it was properly submitted but has been rendered immaterial by other findings, or if it called for a finding not within the jury's province, such as a question of law. *Spencer,* 876 S.W.2d at 157.

In reviewing a grant of JNOV, the reviewing court must determine whether there is any evidence upon which the jury could have made the finding. *See id.* The reviewing court must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *see also Tiller,* 121 S.W.3d at 713 (holding that, in reviewing "no evidence" point, court views evidence in light that tends to support finding of disputed fact and disregards all evidences and inferences to contrary). To sustain a challenge to the legal sufficiency of the evidence to support a jury finding, the reviewing court must find that: (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of evidence or law from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 903 (Tex.2004). If some evidence supports the disregarded finding, the reviewing court

must reverse and render judgment on the verdict unless the appellee asserts cross-points showing grounds for a new trial. *See M.N. Dannenbaum, Inc. v. Brummerhop,* 840 S.W.2d 624, 628 (Tex.App.-Houston [14th Dist.] 1992, writ denied); *Basin Operating Co. v. Valley Steel Prods. Co.,* 620 S.W.2d 773, 776 (Tex.Civ.App.Dallas 1981, writ ref'd n.r.e.).

In applying these standards, I would hold that the trial court improperly granted the JNOV.

## B. Propriety of the Trial Court's JNOV

In its JNOV, the trial court held that, as a matter of law, the disclaimer of reliance clause in the Purchase Agreement barred the jury from giving any weight to evidence supporting Fazio's fraudulent inducement claim.

### i. Propriety of JNOV overturning the jury's finding that Cypress defrauded Fazio

*(a) The elements of fraudulent inducement*

Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner,* 62 S.W.3d 795, 797–98 (Tex.2001); *Clark v. Power Mktg. Direct, Inc.,* 192 S.W.3d 796, 799 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Thus, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase,* 62 S.W.3d at 798–99.

A contract is subject to avoidance on the ground that it was induced by fraud. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 331 (Tex. 2011); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998) ("As a

rule, a party is not bound by a contract procured by fraud."). Indeed, "the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it." *Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233, 239 (Tex.1957).

The elements of fraud are: (1) that the speaker made a material misrepresentation (2) that he knew was false when he made it or that he made recklessly as a positive assertion without any knowledge of its truth (3) with the intent that the other party act upon it and (4) that the other party acted in reliance on the misrepresentation and (5) suffered injury thereby. *Italian Cowboy*, 341 S.W.3d at 337. Fraud may also occur when (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford*, 48 S.W.3d at 754–55; *JSC Neftegas–Impex v. Citibank, N.A.*, 365 S.W.3d 387, 408 (Tex.App.Houston [1st Dist.] 2011, pet. denied). A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy*, 341 S.W.3d at 337.

In addition, fraud requires a showing of actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex.2010); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001); *JSC Neftegas–Impex*, 365 S.W.3d at 397 n. 3. In evaluating justification, the court considers whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Grant Thornton*, 314 S.W.3d at 923 (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir.1990)).

Generally, the failure to disclose information—which is alleged here—does not constitute fraud unless there is a duty to disclose the information. *Bradford*, 48 S.W.3d at 755; *see Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998); *JSC Neftegas–Impex*, 365 S.W.3d at 408–09 (holding that first element of fraud claim based on failure to disclose material fact within defendant's knowledge is triggered only if defendant has legal obligation to disclose fact). However, "a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression." *Bradford*, 48 S.W.3d at 755. Likewise, a common-law duty to speak applies in certain circumstances, i.e. "(1) one who voluntarily discloses information has a duty to disclose the whole truth; (2) one who makes a representation has a duty to disclose new information when he is aware that the new information makes the earlier representation misleading or untrue; and (3) one who makes a partial disclosure and conveys a false impression has a duty to correct it." *JSC Neftegas–Impex*, 365 S.W.3d at 409.

Silence may be equivalent to a false representation when the particular circumstances impose a duty on the party to speak and the party nevertheless deliberately remains silent. *Bradford*, 48 S.W.3d at 755; *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex.1995). Thus, a seller of real estate has a duty to disclose

material facts that would not be discoverable by the exercise of ordinary care and diligence on the part of a purchaser or which a reasonable investigation and inquiry would not uncover because "where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts." *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979).

Even in the absence of a duty to disclose, a purchaser is entitled to rescind the transaction if an undisclosed fact is basic and is one the seller knows the purchaser would regard as material. *Id.* (holding that careful reading by purchasers of twenty-eight page declaration of reservations received at time contract for sale of lot was executed would not have reasonably alerted them to possibility that inundation easement encumbered lot, and, therefore, purchasers were entitled to rescission). Whether a duty to disclose exists is a question of law. *Bradford*, 48 S.W.3d at 755.

### (b) Cypress's duty to disclose

Fazio argues that Cypress had a duty to disclose and that the jury correctly found that it defrauded him by concealing economic information about the Garden Ridge store material to the purchase of the Property. Cypress argued in its motion for JNOV, and responds on appeal, that it had no duty to disclose to Fazio the economic information that was concealed. I would conclude that Cypress had both a common law and a contractual duty to provide to Fazio the economic information concealed. Thus, Fazio's claims fall within the category of claims for which an action for fraudulent inducement lies.

This case is similar to *Italian Cowboy*. In that case, the Texas Supreme Court held that "commercial tenants are entitled to rely on the fact that a landlord will not actively conceal material information" regarding the condition of the property and misrepresent that information to one not in a position to discover the truth for himself. *See* 341 S.W.3d at 339. Italian Cowboy, which had leased a restaurant site, sued Prudential, the landlord, for withholding its knowledge of an odor problem at the proposed restaurant site and affirmatively stating that the site had no problems. *Id.* at 328, 338–39. The supreme court held that the Prudential agent's "one-sided knowledge of past facts" made her false representations that she had been working with the restaurant site since its inception, that "the building was in perfect condition, never a problem whatsoever," and that there was "nothing wrong with the place at all" actionable under the circumstances of the case. *Id.* at 328, 339. The court stated, "Firsthand knowledge—like [the landlord's]—concerning material information—like an odor problem in a restaurant site—is exactly the sort of scenario that demonstrates the sound policy behind the exception allowing an opinion to be actionable under certain circumstances where material information was withheld." *Id.* at 339; *see also Bradford*, 48 S.W.3d at 754–55 (holding that fraud may occur when party conceals or fails to disclose material fact within its knowledge of which it knows other party is ignorant, while knowing other party does not have equal opportunity to discover truth and intending to induce that party to take some action by concealing or failing to disclose fact, and other party suffers injury as result of acting without knowledge of undisclosed fact).

Here, the LOI expressly provided, "Seller will provide Buyer with all information in [its] possession including, but not limited to the following" listed documents. The LOI became binding under its terms when the Purchase Agreement was signed on September 19, 2003. Cypress knew from

the express representation in the LOI that Fazio had based his offer of $7,667,000 for the Property in the LOI on Cypress's "currently reported absolute net income of $805,040." It further knew that this income was generated by rental income received from Garden Ridge. Cypress also knew that Fazio was seeking all documents in its possession material to the purchase of the Property and that it had promised to provide them, and it knew that Garden Ridge was restructuring its leasehold obligations, that Garden Ridge "need[ed] to reduce [its] occupancy costs at [Cypress's] premises," that one of the leaseholds Garden Ridge intended to restructure was the Garden Ridge store on the Property Fazio was investigating, and that Keen, Garden Ridge's restructuring consultation firm, and Cypress had discussed at least three times a 30% annual rent reduction for the Garden Ridge store in the total amount of $241,512. Finally, Cypress knew that its own lender had demanded the personal guaranty from its president of the outstanding $5,704,000 loan secured by the Property.

In accordance with the due diligence provision in the LOI, Fazio, an experienced real estate investor, and his agents conducted due diligence before Fazio signed the Purchase Agreement, including requesting and reviewing all financial information about the Property in Cypress's possession. When Fazio discovered disturbing information about Garden Ridge in the financial statements provided to him, he conducted further investigations with both Garden Ridge and Cypress. He was repeatedly assured that all was well and that Garden Ridge anticipated strong sales, and, for that reason, Garden Ridge had taken out a large inventory loan from Bank of America to finance the Christmas season.

There is undisputed evidence in the record that Fazio's agent asked Cypress for all information and "every scrap of paper" that Cypress had regarding the Property and that Cypress knowingly suppressed (1) the March 5, 2003 letter from Keen to Cypress's President, Maguire, stating that Garden Ridge was "restructuring" and would "need to reduce our occupancy costs at your premises"; (2) two letters from Keen regarding specific properties, including the Property at issue here; (3) Keen's repeated communications with Cypress's Director of Finance seeking a 30% rent reduction on the Property; and (4) Cypress's lender's August 14, 2003 demand that Maguire execute a personal guaranty of the $5,704,000 loan secured by the Property. Cypress possessed all of this information before it executed the LOI containing Fazio's offer to pay Cypress $7,667,000, which was expressly "[b]ased on the currently reported absolute net income of $805,040." A reasonable person in Fazio's position would have attached importance to these facts. And such an investor would have wanted to know that four days after the September 19, 2003 execution of the Purchase Agreement for the Property, Maguire signed the guaranty requested by Guaranty Bank, knowing that it would be extinguished by the sale of the Property to Fazio, which closed on October 31, 2003.

I would hold that Cypress had a duty under the terms of the LOI to disclose all information in its possession material to Fazio's purchase of the Property prior to the execution of the Purchase Agreement. I would further hold that Cypress's superior knowledge of past facts regarding the financial stability of Garden Ridge which it actively concealed, knowing that Fazio was unaware of those facts and did not have an equal opportunity to discover the truth and intending to induce him to purchase the Property, made Cypress's suppression of

information about Garden Ridge's restructuring, its negotiations with Garden Ridge's representatives over rent reduction, and the personal guaranty required of Maguire by the lender for the Property actionable under the circumstances. *See Italian Cowboy,* 341 S.W.3d at 338; *Bradford,* 48 S.W.3d at 754–55. Thus, I would hold that Cypress's active concealment of this material information, which it was under both a contractual and a common-law duty to disclose, was fraudulent as a matter of law. *See Italian Cowboy,* 341 S.W.3d at 338–39.

The question thus arises whether Fazio's reliance on the completeness of Cypress's disclosures about the financial condition of the Garden Ridge Store was justified, given the disclaimer of reliance in the Purchase Agreement he signed.

*(c) Fazio's alleged waiver of reliance*

In his second issue, Fazio argues that his fraudulent inducement claim was not waived by the disclaimer of reliance, or by the merger and "as is" clauses, in the Purchase Agreement. Cypress argued successfully in its motion for JNOV, and argues on appeal, that it was.

First, and most importantly, Cypress's failure to disclose occurred during the due diligence period subject to the LOI—*not* after the execution and effective date of the Purchase Agreement. The disclaimer of reliance in a Purchase Agreement induced by fraud cannot apply retroactively to remove a pre-existing duty to disclose information material to entry into the contract. Once fraud is proved, a fraudulently induced contract is void. *See Italian Cowboy,* 341 S.W.3d at 331 (holding that contract is subject to avoidance on ground that it was induced by fraud). The law is well-established that a disclaimer of reliance does not waive fraud in the inducement to contract. *Id.* The contract with the reliance provision is voided by the

proof of fraud. Even a written contract containing a merger clause can be avoided for fraud in the inducement, and the parol evidence rule will not stand in the way of proof of such fraud. *Id.*

A party to a contract may contractually waive reliance on disclosures through a disclaimer or merger clause. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 178–79, 181 (Tex.1997). The question of whether an adequate disclaimer of reliance exists so as to negate a claim of fraudulent inducement is a question of law. *Italian Cowboy,* 341 S.W.3d at 333.

In *Forest Oil Corp. v. McAllen,* the Texas Supreme Court clarified the factors for the court to consider in determining whether, under the circumstances in this case, a disclaimer of reliance bars a fraudulent inducement claim:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

268 S.W.3d 51, 60 (Tex.2008) (holding that waiver-of-reliance provision precluded fraudulent inducement claim with respect to arbitration clause in release). Thus, in this case, the disclaimer of reliance would have to "clearly and unequivocally" relieve Cypress of any duty to disclose material financial information material to the value of the Property with the Garden Ridge store on it during the disclosure period in order to bar Fazio's fraudulent inducement claim. This it did not do.

To determine whether the language of the disclaimer "clearly and unequivocally"

disclaimed Fazio's reliance on Cypress's disclosures and failures to disclose, we apply the ordinary principles of contract construction. *See Italian Cowboy,* 341 S.W.3d at 332. "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Id.* at 333. To determine intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quoting *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003)); *see Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). We begin with the contract's express language. *Italian Cowboy,* 341 S.W.3d at 333. In construing a contract, we give terms their "plain and ordinary meaning unless the [contract] indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex.2009); *see U.S. Denro Steels, Inc. v. Lieck,* 342 S.W.3d 677, 682 (Tex.App.-Houston [14th Dist.] 2011, pet. denied). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Italian Cowboy,* 341 S.W.3d at 333 (quoting *Coker,* 650 S.W.2d at 393); *see John Wood Grp. USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 16 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Only when a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine its true meaning. *Italian Cowboy,* 341 S.W.3d at 333–34.

"The intent of the parties to be bound is an essential element of an enforceable agreement and is often a question of fact," but where the "intent is clear and unambiguous on the face of the agreement, it may be determined as a matter of law." *John Wood Grp.,* 26 S.W.3d at 16. Courts determine whether a contract is ambiguous by examining it as a whole in light of the circumstances present when it was executed by the parties. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *U.S. Denro Steels,* 342 S.W.3d at 683. Courts also bear in mind the particular business activity to be served and, when it is possible and proper to do so, avoid a construction that is unreasonable and inequitable. *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987); *U.S. Denro Steels,* 342 S.W.3d at 682.

Article V of the Purchase Agreement specified Cypress's duty to provide to Fazio during the first ten days of the designated due diligence period certain defined Documents having to do with the condition of the Property; and it set out the parameters of that duty, including its disclaimer of responsibility for the accuracy and completeness of the defined Documents, all of which dealt with the condition of the Property, not with the economics of the purchase transaction.

Section 5.2 of the Purchase Agreement, titled "Document Review," which set out the only disclaimer in the body of the Purchase Agreement, was restricted by its own terms to a disclaimer of reliance on "the truth, accuracy, or completeness of the Documents" and, "[e]xcept with respect to any express warranties made in this Agreement," to a disclaimer of reliance and waiver of liability for "representations or warranties, express or implied, statements of fact, and other matters contained in the Documents." The "Documents" to which the disclaimer referred were expressly defined in the Purchase Agreement as "(i) copies of the Lease and all amendments thereto; (ii) the Survey; (iii) copies of any Plans; (iv) to the extent allowed by the author, copies of all existing soil, engineering, architectural, and environmental reports covering the Property

in Seller's possession; (v) copies of all Service Contracts, if any; and (vi) copies of all Permits."

The defined Documents to which the disclaimer expressly applied did not include the financial documents in Cypress's possession that it knew to be material to the sale. Thus, that language cannot form the basis for concluding that the disclaimer of reliance in the Purchase Agreement clearly and unequivocally waived Cypress's duty to disclose.

There are only two remaining bases potentially supporting waiver of reliance. The first occurs in the sentence following the statement in the disclaimer that "Seller has not made and does not make any warranty or representation regarding the truth, accuracy, or completeness of the Documents or the source(s) thereof":

> Except with respect to any express warranties made in this Agreement, Seller expressly disclaims and Purchaser waives any and all liability for representations and warranties, express or implied, statements of fact, and other matters contained in the Documents, or for any omissions from the Documents, or in any other written or oral communication transmitted or made available to Purchaser.

The second is a similarly general statement at the end of the paragraph:

> Except with respect to any express warranties made in this Agreement, Purchaser shall rely solely upon its own investigation with respect to the Property, including, without limitation, the Property's physical, environmental, or economic condition, compliance or lack or compliance with any ordinance, order, permit, or regulation or any other attribute or matter relating thereto.

It is clear from the plain language of these provisions that the disclaimer of reliance clearly and unequivocally expressed

Fazio's intent to rely on his own and his agents' inspections of the "Real Property" and to waive reliance on the accuracy and completeness of the defined Documents regarding the condition of the Real Property. However, it is unreasonable as a matter of law to read the two boiler-plate, general statements in the disclaimer in Article V, dealing with property inspections, as clearly and unequivocally waiving Fazio's right to rely on Cypress's fulfillment of its common law and contractual duty to disclose all material financial information about the Garden Ridge store. Under the principle of *ejusdem generis*, "[W]hen words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." *State v. Fid. & Deposit Co. of Md.*, 223 S.W.3d 309, 312 (Tex.2007) (per curiam); *Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex.2003). Likewise, under the principle of *expressio unius est exclusio alterius*, or "the expression of one is the exclusion of the other," "it is a settled rule that the express mention or enumeration of one person, thing, consequence or class is equivalent to an express exclusion of all others." *Johnson v. Second Injury Fund*, 688 S.W.2d 107, 108–09 (Tex.1985) (quoting *State v. Mauritz–Wells Co.*, 141 Tex. 634, 175 S.W.2d 238, 241 (1943)).

The disclaimer of reliance in the section of the Purchase Agreement entitled "Document Review" can only reasonably be read as being limited to omissions and communications with respect to the lease, the survey, copies of any plans, existing soil, engineering, architectural, and environmental reports, service contracts, and permits in Cypress's possession. Likewise, in this context, the general statement—that "[e]xcept with respect to any express warranties made in this Agree-

ment" Fazio was relying "solely upon [his] own investigation with respect to the Property, including, without limitation, the Property's physical, environmental, or economic condition, compliance or lack of compliance with any ordinance, order, permit, or regulation or any other attribute or matter relating thereto"—clearly refers to Fazio's agreement to rely on his own investigation of the condition of the real property and does not express his intention to waive reliance on the truthfulness and completeness of Cypress's disclosures of economic information about Garden Ridge.

The disclaimer clearly does not unequivocally express Fazio's intention to waive either Cypress's duty of disclosure of all information in its possession under the terms of the LOI or Cypress's common law duty to disclose fully and truthfully, and not to actively and misleadingly conceal, material financial information about the Property in its possession which it knew Fazio did not know of and did not have an equal opportunity to discover. *See Italian Cowboy,* 341 S.W.3d at 339 ("[C]ommercial tenants are entitled to rely on the fact that a landlord will not actively conceal material information."); *Bradford,* 48 S.W.3d at 754–55; *see also Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 162 (Tex.1995) (holding that buyer is not bound by agreement to purchase something "as is" that he is induced to make by fraudulent representation or concealment of information by seller).

Similarly, the standard boiler-plate "as is" clause in the Purchase Agreement is expressly limited by its terms to Fazio's agreement "to accept the property 'as is,' 'where is,' and 'with all faults', subject to any physical or environmental condition which may exist, and without the existence of and reliance on any representation or warranty by Seller." This "as is" clause, by its own terms, is limited to the physical or environmental condition of the Property. It does not, under any reasonable construction, waive reliance on Cypress's duty under the LOI to disclose the complete financial condition of the Garden Ridge store. *See Italian Cowboy,* 341 S.W.3d at 340–41; *Schlumberger,* 959 S.W.2d at 181; *Jefferson Assocs.,* 896 S.W.2d at 162.

Nor can the standard boiler-plate merger clause in the Purchase Agreement be reasonably interpreted as waiving Fazio's fraudulent inducement claim. *See Italian Cowboy,* 341 S.W.3d at 334 (holding that when parties have merely recited "the provisions of a standard merger clause," they have not shown intent to include disclaimer of reliance on representations) (citing 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 33.21 (4th ed. 1999) ("Recitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing … are commonly known as merger or integration clauses.")). This is particularly the case where the LOI expressly stated that its terms became "binding on both parties" only upon execution of the formal Purchase Agreement.

I would hold that neither the disclaimer of reliance, nor the "as is" clause, nor the merger clause in the Purchase Agreement contains "clear and unequivocal language expressly disclaiming reliance on representations, and representing reliance on one's own judgment" that waived Fazio's fraudulent inducement claim, which was based on Cypress's concealment of economic information in its possession material to the purchase of the Garden Ridge store that it was required by the express terms of the LOI to produce to Fazio.

Because there was no clear and unequivocal disclaimer of reliance as required by *Schlumberger* and *Forest Oil,* I do not find it necessary to review the circumstances surrounding the formation of the parties' agreement under the remaining *Forest Oil* factors. *See Forest Oil,* 268 S.W.3d at 60 (holding disclaimer of reliance was to be negotiated, rather than boilerplate and release language was clear); *Schlumberger,* 959 S.W.2d at 179 (holding that clear and unequivocal language is necessary to bar fraudulent inducement claim); *see also Italian Cowboy,* 341 S.W.3d at 337 n. 8 (holding that only where there is clear and unequivocal disclaimer of reliance must analysis "proceed to 'the circumstances surrounding [the contract's] formation,' in order to determine whether such a provision is binding on the parties involved").

I would sustain Fazio's first and second issues and hold that the trial court erred in entering JNOV disregarding the jury's answer to Question 1(A) on Fazio's fraudulent inducement claim. Therefore, the JNOV must be reversed.

### ii. Propriety of JNOV solely on issue of damages

The en banc majority skips the jury's answer to Question 1(A), finding that Cypress defrauded Fazio, and it affirms the JNOV solely on the issue of damages. It concludes that the jury's answer to Question 2(1)—finding restitution damages due to Fazio for the fraud found in response to Question 1(A)—is immaterial and must be disregarded. I turn, therefore, to whether the en banc majority correctly affirmed the trial court's JNOV on the basis of the jury's answer to Question No. 2(1).

The trial court could disregard the jury's finding under Question 2(1) only if a directed verdict would have been proper, if the finding is immaterial, or if there is no evidence to support the finding. *See* Tex.R. Civ. P. 301; *Tiller v. McLure,* 121

S.W.3d 709, 713 (Tex.2003). A directed verdict is proper under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000).

Here, the jury's finding, in response to Question 1(A), that Cypress Equities fraudulently induced Fazio to purchase the Property, necessarily included a finding that Fazio had borne his burden of establishing all of the elements of Cypress's fraud, including his injury by the fraud. *See Italian Cowboy,* 341 S.W.3d at 337 (providing that injury to plaintiff is element of fraud). The jury further found, in response to Question 5, that there was clear and convincing evidence that the harm to Fazio resulted from Cypress's fraud; and, in Question 6, it awarded Fazio exemplary damages based on its finding of fraud.

By concluding that the JNOV was proper, the en banc majority necessarily has to have concluded that Cypress's misrepresentations and concealment of information caused no harm to Fazio as a matter of law. There was undisputed evidence that Fazio was unable to recover approximately $3.9 million of his original $7.6 million investment in the Property. In order for this injury to be immaterial, as required to support the JNOV, the en banc majority must show that, as a matter of law, this loss on his original, fraudulently-induced investment was not a compensable injury under *any* proper measure of damages.

Although Cypress argues that Question 2(1), measuring restitution damages, should not have been submitted to the jury and that only Question 2(2), measuring benefit-of-the-bargain damages, is a prop-

er measure of damages for fraud, its argument is more properly construed as an argument that Question 2(1) was a defective instruction, not as an argument that the damages finding was immaterial. The jury's findings on other questions support a conclusion that it found that Fazio was damaged by Cypress's fraud. Whether he succeeded or not, Fazio attempted in Question 2(1) to submit a proper question on a key element of his case, damages. Assuming, then, that Question 2(1) was an erroneous instruction—a point that I do not concede—the remedy under the supreme court authority cited by the en banc majority would be to order a new trial, not to grant JNOV. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997) ("Because the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error. But, because we find some evidence that Arthur Andersen's misrepresentation was a producing cause of PECO's loss, we remand this case for a new trial."); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 44 (Tex.2007) ("[I]f the plaintiff submits a jury question on his claim that is merely 'defective,' as opposed to 'immaterial,' the appropriate remedy is to remand for a new trial rather than to render judgment."); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (holding that remand is proper when defective liability question is submitted).

Thus, I would hold that the trial court erred to the extent it granted JNOV on the issue of damages, and the en banc majority errs in affirming the JNOV solely on that ground. If the en banc majority were correct in holding that the trial court submitted an incorrect measure of damages to the jury in Question 2(1), it should overturn the JNOV and remand the case for a new trial. But, for the reasons stated below, I do not agree with the en banc majority that the measure of damages set

out in Question 2(1) was incorrect. I believe that Question 2(1) properly instructed the jury on restitution damages, which is a proper measure of damages for fraudulent inducement.

## Damages

The jury found, in response to Question 2(1), that $3,961,524.60 represented the difference between the price Fazio paid for the Property and the amount he received when he eventually sold the Property. In his third issue, Fazio contends that the trial court erred in disregarding the jury's answer to Question 2(1) on the ground that the evidence was legally and factually insufficient to show that he suffered damages as measured by the difference between the value of the Property at the time it was purchased and the amount he paid for it on that day, as required by Texas law. Fazio contends that restitution damages are a proper measure of damages for fraud under Texas law and that, because he would not have entered the transaction but for Cypress's fraud, the jury properly awarded him restitution damages that restored to him all of the money he paid for the Property, subtracting the value at which he sold the Property, and, thus, restored him to his position prior to the fraud.

Cypress argues (and the en banc majority agrees) that the only correct measures of damages were the expectancy, or benefit-of-the-bargain, measure or rescission as measured in the *absence* of fraud—a measure designed to restore *both* parties to the position they were in prior to the sale of the Property. Cypress points out that, in its objection at trial, it argued that Question 2(1) was not "legally recognized as a measure of damages for fraud to the extent that it attempts to instruct the jury on the benefit of the bargain measure or the out-of-pocket measure" because it "im-

properly measures the value received in the future and not at the time the property was transferred or the transaction was consummated." Cypress further argues that "there is no evidence to support any difference in the value of the property at the time the purchase agreement was executed and the price that Mr. Fazio paid for it. The only evidence of value at the time the purchase agreement was executed confirms that plaintiffs suffered no damages." Cypress, citing *Arthur Andersen*, argues that Fazio "ignores the black-letter principle that a fraud claim requires a showing of damages, and those damages must be assessed at the time the Property was purchased."

However, Cypress's argument conflates apples and oranges. Question 2(1) did *not* attempt to instruct the jury on benefit-of-the-bargain or out-of-pocket damages, as Cypress contends; Question 2(2) did that. Question 2(1) instructed the jury on *restitution* damages. Nevertheless, the en banc majority agrees with Cypress, and it concludes that the trial court properly entered a take-nothing judgment against Fazio because Question 2(1) did not properly instruct the jury on benefit-of-the-bargain damages, which is not, in fact, a contested issue. It also concludes that Fazio was not entitled to recover rescission damages, which are a type of restitution damages, under Question 2(1) because rescission is not an appropriate remedy in this case (which is incorrect, as shown below) and because Question 2(1) did not ask the jury to determine Fazio's fraud-induced losses.

Damages for fraud in the sale of real estate typically conform to one of two measures of damages: an "out-of-pocket" measure or a "benefit of the bargain" measure. *See, e.g., Formosa Plastics*, 960 S.W.2d at 49; *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex.1988); *see also Quigley v. Bennett*, 227 S.W.3d 51,

56 (Tex.2007) (Brister, J., concurring and dissenting) ("[F]raud cases uniformly list only two damage measures: expectancy and reliance."). "The 'benefit of the bargain' measure, which utilizes an expectancy theory, evaluates the difference between the value as represented and the value actually received." *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992); *see Formosa Plastics*, 960 S.W.2d at 49. "Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received." *Arthur Andersen*, 945 S.W.2d at 817; *Formosa Plastics*, 960 S.W.2d at 49. The en banc majority in this case assumes that benefit-of-the-bargain and out-of-pocket expectancy are the *only* types of damages available for fraud, and it assumes that, because the jury found no out-of-pocket damages in response to Question 2(2), that it could not have properly found restitution damages in response to Question 2(1).

However, Texas courts have also held under general principles of common-law fraud that one who is induced by fraud to enter into a contract may elect an equitable remedy of restitution or rescission that would restore him to the position he would have been in had he not been the victim of fraud. *See Italian Cowboy*, 341 S.W.3d at 346 ("When rescission of a lease is appropriate for breach of the implied warranty of suitability, a tenant is entitled to be restored to the position it would have been in had it not leased the premises that turned out to contain a latent defect rendering the premises commercially unsuitable."); *see also Quigley*, 227 S.W.3d at 56–57 (Brister, J., concurring and dissenting) (discussing restitution damages in context of fraud and stating that "restitution can be recovered in fraud cases" but it "is generally not listed, perhaps because it is an equitable rather than a legal remedy, or because it is available even without a

showing of fraud"); *Henry S. Miller Co.*, 836 S.W.2d at 162–63 (holding, in DTPA case, that evidence supported award of damages in total amount of plaintiff's capital investment in lease venture for beauty shop, minus amount plaintiff received back from venture, including money received when plaintiff sold beauty shop business, as part of plaintiff's "actual loss" even though plaintiff did not present evidence to support "out-of-pocket" or "benefit-of-the-bargain" measure of damages); RESTATEMENT· (FIRST) OF RESTITUTION § 152 (1937) ("Where a person is entitled to restitution from another because the other has obtained his services, or services to which he is entitled, by fraud, duress or undue influence, the measure of recovery for the benefit received by the other is the market value of such services irrespective of their benefit to the recipient.") (quoted in *Quigley*, 227 S.W.3d at 56 n. 8 (Brister, J., concurring and dissenting)).

" '[R]estitution' ... means the act of restoring or a condition of being restored." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex.2012). Restitution is generally defined as an equitable remedy under which a person is restored to his or her original position before the loss or injury. *In re J.R.*, 907 S.W.2d 107, 109 (Tex.App.-Austin 1995, no writ). Restitution "involves restoring property or money taken from the plaintiff," and, "[u]nlike other contractual damages, restitution focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff." *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex.App.-Austin 1992, no writ). " '[R]escission is one of the principal asset-based remedies in restitution,' and it 'restore[s] the parties to the status quo ante by unwinding the contractual exchange instead of pressing it forward.' " *Cruz*, 364 S.W.3d at 825 (quoting RESTATEMENT (THIRD) OF RESTITUTION

AND UNJUST ENRICHMENT § 37, cmt. a). "Rescission is a form of restitution that applies if the transaction may still be unwound; if it cannot, a plaintiff may sue for damages." *Id.*

This Court explained the availability of restitution or rescission damages in fraud cases in *Nelson v. Najm,* stating:

> In addition to these alternative measures of damages, [the out-of-pocket measure and the benefit-of-the-bargain measure], Texas courts have long held under general principles of common-law fraud that one who is induced by fraud to enter into a contract has a choice of remedies: he may either recover the monetary damages flowing from the fraud or he may elect the equitable remedy of rescission in lieu of damages and demand a return of any amount paid. This election of remedies recognizes that, depending on the circumstances, a defrauded party may not be made whole by a recovery of actual damages, but instead may need an equitable remedy such as rescission. *Id.*

127 S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (internal citations omitted). Recently, the supreme court has reaffirmed that "[r]escission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract." *Italian Cowboy,* 341 S.W.3d at 345.

Here, the jury was given two instructions regarding damages. The first, in Question 2(1), sought a finding on restitution or equitable damages; and the second, in Question 2(2), sought a finding on benefit-of-the-bargain or expectancy damages. Question 2(1) asked the jury to calculate the difference between the total amount

Fazio invested in the Property—the amount he paid for the Property under the belief that the Garden Ridge would continue to make payments of $805,040.00—and the amount he received back when he sold the Property. The jury found, in response to Question 2(1), that "[t]he difference between the price the Fazios paid for the Property and the amount they received when they sold the Property" was approximately $3.9 million. In other words, the amount of money it took to restore to Fazio the consideration he paid for the Property, which the jury found he would not have paid to Cypress but for the fraud, was $3.9 million. The measure of damages in Question 2(1) conformed to a restitution theory of damages under which Fazio was entitled to be put back into the position he occupied before the fraud. See Cruz, 364 S.W.3d at 825; Italian Cowboy, 341 S.W.3d at 346; Quigley, 227 S.W.3d at 56–57 (Brister, J., concurring and dissenting). This was a proper calculation to arrive at the amount of money that would return to Fazio the consideration he paid upon entering the fraudulently-induced agreement. See Italian Cowboy, 341 S.W.3d at 345–46; Nelson, 127 S.W.3d at 176.

The jury also found, in response to Question 2(2), that "[t]he difference, if any, between the price the Fazios paid for the Property and the value of the Property at the time the Purchase Agreement was executed" was $0. Question 2(2) conformed to an out-of-pocket or reliance measure of damages—the difference between the value Fazio, as the buyer, paid and the value of the Property he received. See Arthur Andersen, 945 S.W.2d at 817. Thus, in finding no damages under Question 2(2), the jury found only that Fazio had not proved his entitlement to out-of-pocket or reliance damages. This finding was irrelevant to a restitution finding. Fazio was not limited to seeking the damages that flowed from the difference between the value of the Property at the time of the sale (when the Property had a valuable lease on it) and the consideration paid by Fazio for the Property with a lease on it. Fazio was also entitled to seek an equitable remedy that would put him back in the position he was in before he was induced by Cypress's fraud to buy the Property with a valuable lease that Cypress knew was about to evaporate—information material to the sale which it fraudulently concealed from Fazio.

Fazio testified that he sought out investments that fit a particular profile, i.e., single tenant/triple-net properties in which the tenant pays rent, taxes, common area maintenance fees, and insurance. Fazio offered to pay Cypress $7,667,000 for the Property based on Cypress's report at the time of sale of "absolute net income of $805,040.00" and his investigation into the financial soundness of the Property and tenant. The jury determined that Cypress Equities fraudulently withheld material information indicating that the lease would not be renewed, and, in fact, Fazio received rent payments for only two months before Garden Ridge declared bankruptcy and quit paying rent. Fazio testified that he would not have entered into the contract at all had he known the information that Cypress withheld, namely that the $805,040 lease would not be renewed because the Garden Ridge store was about to declare bankruptcy.

Thus, there was more than a scintilla of evidence to support the jury's conclusion that Fazio's injury from Cypress's fraud did not arise from the difference between the amount he paid (for the real property plus a purportedly valuable lease) and the value of the property he received (real property with a still-valid $805,040 lease) on the day he received it. Rather, his injury was caused by his entering into the contract at all—an action he would not

have taken but for Cypress's fraud in concealing from him the fact that the lease was about to evaporate, taking a substantial amount of the value of the Property with it. These circumstances justify a finding that Fazio's injury, at the time of the sale, was properly measured by the total amount he paid as consideration that he would not have paid to Cypress but for the fraud and that he was entitled to be restored to the position he was in before he was fraudulently induced to contract with Cypress for the purchase of the Property. And, indeed, the jury found the evidence that Fazio was fraudulently induced to buy the Property sufficiently clear and convincing to award exemplary damages. In other words, the jury properly measured Fazio's injury under the equitable restitution or rescission standard. *See Italian Cowboy,* 341 S.W.3d at 346 (allowing tenant to be restored to position it would have been in had it not leased premises that turned out to contain latent defect rendering premises commercially unsuitable); *Henry S. Miller Co.,* 836 S.W.2d at 162–63 (awarding damages in total amount of plaintiff's capital investment in lease venture for beauty shop, minus amount plaintiff received back from venture, as part of plaintiff's "actual loss" even though plaintiff did not present evidence to support "out-of-pocket" or "benefit-of-the-bargain" measure of damages); *see also Quigley,* 227 S.W.3d at 56–57 (Brister, J., concurring and dissenting) (discussing restitution damages in context of fraud).

The majority concludes that Question 2(1), measuring restitution damages, "does not measure damages that were foreseeable and directly traceable to the misrepresentation." Op. at 396. But this conclusion is simply incorrect. In finding that Fazio was fraudulently induced to enter into the contract with Cypress, the jury necessarily found that Cypress withheld

material information regarding the impending bankruptcy of the Garden Ridge store on the Property with the intent that Fazio purchase the Property at a price justified for a property with a valuable lease on it, but not otherwise, and that Fazio did rely on Cypress's misrepresentations and concealments and invested over $7.6 million in the purchase of the Property, which he would not have purchased had he known the concealed information. This is fraud justifying restitution damages. *See Italian Cowboy,* 341 S.W.3d at 337 (listing elements of claim for fraud and finding rescission appropriate remedy for fraudulent inducement); *Bradford,* 48 S.W.3d at 754–55 (providing that fraud may occur when party conceals or fails to disclose material fact within its knowledge of that party with intent to induce another party to take some action and that other party suffers injury as result of acting without knowledge of undisclosed fact). Thus, I would hold that Fazio's damages in the form of the amount he paid for the Property were a direct and foreseeable consequence of Cypress's action in inducing Fazio into a contract by withholding material information and that the jury's response to Question 2(1), finding the difference between the amount Fazio paid for the Property and the amount of the investment he was able to recover upon the sale of the Property, was a proper measure of damages for the fraud.

I also disagree with the en banc majority that the cases it cites support its argument. In reaching its conclusion that Question 2(1) was an improper measure of damages and Question 2(2) was the exclusive proper measure, the majority relies on *Arthur Andersen, Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369 (Tex.1984), and *Woodyard v. Hunt,* 695 S.W.2d 730 (Tex.App.-Houston [1st Dist.] 1985, no writ). However, these cases are distin-

guishable from the present case because they do not address the issue of the equitable remedy of restitution or rescission in the context of fraud.

The en banc majority also states that restitution or rescission is not an appropriate remedy here. It argues that, "[a]s the jury found that Fazio received property equal to what he paid for it, and that the fraud was not a proximate cause of damages under a proper measure, rescission is not an appropriate remedy." Op. at 425. The problem is that the jury *did* find that the fraud was a proximate cause of Fazio's damages, and it made that finding under a proper measure of restitution or rescission damages. In stating that "rescission is not an appropriate remedy" in this case, the majority misconstrues the supreme court's opinion in *Cruz* as holding that rescission "requires a mutual restoration and accounting, in which each party restores property received from the other." Op. at 396 (citing *Cruz,* 364 S.W.3d at 823–24, 826). This is sometimes, but not always, the case; and it is not the case here.

In *Cruz,* Andrews Restoration brought a breach of contract action against Cruz, the homeowner, relating to repairs it did on Cruz's home for which it was never paid. 364 S.W.3d at 820–21. Cruz counterclaimed for fraud, fraudulent inducement, negligent misrepresentation, and violations of the DTPA. *Id.* The trial court held, as a matter of law, that Andrews Restoration's failure to include language required by the Texas Property Code in its contract with Cruz was a false, misleading, or deceptive act that was a producing cause of injury to Cruz. *Id.* at 821. The jury *also* found, however, that Cruz had breached his agreement with Andrews Restoration and that the company's damages were $705,548.02, the amount of its unpaid invoices. *Id.* Thus, there was fault on both

sides. The jury further found, in response to the trial court's instruction that it had already concluded Andrews Restoration had violated the DTPA, that Cruz was entitled to $0 in damages. *Id.* In spite of this finding of $0 in damages, Cruz argued that he was entitled to the amounts that the trial court found had been paid—both by himself and by his insurance company—under his agreement with Andrews Restoration. *Id.* at 823.

The supreme court determined that Cruz was not entitled to the remedy under the DTPA allowing a trial court to "restore illegally acquired money or property" because "[t]he statute's clear language provides a cause of action only to consumers who have sustained damages, and the jury awarded Cruz none." *Id.* The supreme court further held that, even if Cruz had prevailed on his DTPA claim, he was not entitled to an order restoring all amounts paid under the contracts without deducting the value received under those agreements. *Id.* at 824. It observed that "Cruz seeks to rescind the agreements—he asks for all the money paid by him or on his behalf under the agreements—without surrendering the benefits he received." *Id.* at 825. In this context, the court stated that "rescission is not a one-way street. It requires a mutual restoration and accounting, in which each party restores property received from the other." This is a clearly correct statement of the law when there is wrong-doing on both sides. However, the court then went on to state:

> Generally, rescission is an equitable remedy, and Cruz correctly asserts that fault is relevant. A defendant's wrong-doing may factor into whether he should bear an uncompensated loss in those cases in which it is impossible for a claimant to restore the defendant to the status quo ante. But it does not excuse the claimant in such cases from counter-

restitution when feasible—as it would be here.

*Id.* at 826 (internal citations omitted).

Here, unlike in *Cruz,* the jury found that Cypress Equities had fraudulently induced Fazio into purchasing the Property. The result of its fraudulent inducement was that Cypress received $7,667,000 that Fazio paid for a property that he would not have bought had he not been defrauded. Fazio did not seek a windfall by seeking the return of all $7,667,000 back from Cypress. Instead, he sold the Property at fair market value for a property of its size without a valuable lease on it; he sought to recover from Cypress only the difference between that amount and the amount necessary to restore him to the position he was in before Cypress fraudulently induced him to invest $7,667,000 in the Property; and the jury awarded him that difference in response to Question 2(1). Thus, this is a case in which Cypress's wrongdoing factors into whether it should bear an uncompensated loss for the $3.9 million that Fazio was not able to recover through subsequent resale of the Property. *See id.; see also Bynum,* 836 S.W.2d at 162–63; *City of Harker Heights,* 830 S.W.2d at 317 (holding that restitution "involves restoring property or money taken from the plaintiff" and that, "[u]nlike other contractual damages, restitution focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff). The circumstance regarding the transaction between Cypress and Fazio indicates that counter-restitution is not only unfeasible, unlike the situation in *Cruz,* but it would be unjust in light of Cypress's fraudulent conduct.

I would hold that Question 2(1) sought damages for Cypress's fraud under a proper measure and there was more than a scintilla of evidence to support the jury's

finding. Therefore, the trial court erred in granting JNOV on this issue. *See Tiller,* 121 S.W.3d at 713. And, the en banc majority errs in affirming the JNOV on this ground.

I would sustain Fazio's third issue.

### Remaining Issues

### A. Apportionment of Liability

In his fourth issue, Fazio argues that the evidence was sufficient to show that Cypress Equities, Inc., Cypress/GR Houston I, L.P. and Cypress/GR Houston, Inc. operated as a single business enterprise and that Cypress Equities was the agent for the seller and was 100% responsible for the harm to Fazio, as found by the jury in response to Questions 3 and 4; therefore, the trial court erred in disregarding the jury's answers to these questions and in granting JNOV and a take-nothing judgment.

Here, the jury charge in Question 1—regarding fraud—and Question 4—regarding piercing the corporate veil—included both prongs of the proof of liability of one business entity for the debts of another under an alter ego theory. The evidence showed that the LOI was negotiated by, "agreed and accepted" by, and signed by Cypress Equities as seller of the Property. The Purchase Agreement was executed by Cypress/GR Houston I, L.P. as seller. The evidence further showed that Cypress Equities was solely responsible for developing and marketing the Property. Cypress Equities' President, Maguire, made the decision to sell the Property; its employees, including Maguire and Claro, communicated with potential buyers and their agents, including Fazio's agents, Silver and Banks; Cypress Equities negotiated and executed the LOI and obtained a confidentiality agreement regarding disclosure of Garden Ridge's financial informa-

tion; it conducted discussions with Garden Ridge regarding its financial condition; it negotiated the sales price of the Property; it closed the transaction; its employee, Claro, was Cypress's principal contact person for the sale to Fazio; and one of its employees was primarily responsible for handling the sale. The Property's owner, Cypress/GR Houston I, L.P., was a single-purpose entity created to own the property. It had no employees and no assets.

I would hold that the evidence was sufficient to support the jury's finding, in response to Question 4, that the Cypress entities, including Cypress Equities and Cypress/GR Houston I, L.P., constituted a single business enterprise and that Cypress/GR Houston I, L.P. and Cypress Equities were alter egos of each other. *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 452, 455 (Tex.2008) (holding "single business enterprise" theory "applies whenever two corporations coordinate operations and combine resources in pursuit of the same business purpose" and "[d]isregarding the corporate structure involves two considerations": (1) "the relationship between [the] two entities" and (2) "whether the entities' use of limited liability was illegitimate"); *Castleberry v. Branscum*, 721 S.W.2d 270, 271–72 (Tex.1986) (holding that corporate veil may be pierced and one entity held liable for debts of another when, among other circumstances, "a corporation is organized and operated as a mere tool or business conduit of another").

Under the circumstances of this case, I would further conclude that the evidence was sufficient to support the jury's response to Question 3, finding that Cypress Equities was 100% liable for the harm to Fazio and that the other Cypress entities, Cypress/GR Houston I, L.P. and Cypress/GR Houston, Inc., Joe Fazio, and Fazio's agents Silver and Banks, had no responsibility for causing the harm.

Therefore, I would hold that the trial court erred in disregarding the jury's answers to Questions 3 and 4 and in granting JNOV on the issue of Cypress Equities' 100% responsibility for the harm the fraud caused Fazio.

I would sustain Fazio's fourth issue.

## B. Exemplary Damages

In his fifth issue, Fazio argues that there was clear and convincing evidence that the harm to him resulted from Cypress's fraud, justifying the imposition of exemplary damages, and that the amount of exemplary damages awarded to him was within statutory and constitutional limits. Cypress responds that exemplary damages are not available where liability is precluded as a matter of law and that Fazio's fraud claim fails as a matter of law. It cites *Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712 (Tex.1987). Cypress also argues that there is no clear and convincing evidence of fraud.

In Question 5, the jury was asked whether it found from clear and convincing evidence that the harm to Fazio resulted from fraud. It was given the same instruction on fraud as in Question 1 and was instructed that " '[c]lear and convincing evidence' means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established." It answered, "yes." In Question 6, the jury was instructed that " 'exemplary damages' means an amount that you may in your discretion award as a penalty or by way of punishment," and it was instructed on the factors to be considered: the nature of the wrong, the character of the conduct involved, the degree of culpability of Cypress Equities, the situation and sensibilities of the parties, the extent to which Cypress Equities'

conduct offended a public sense of justice and propriety, and the net worth of Cypress Equities. In response to Question 6, asking it to award a sum of money as exemplary damages, the jury answered, "$667,000.00."

Exemplary damages may be awarded for fraud only if the claimant's evidence of fraud is clear and convincing. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon Supp.2011). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2) (Vernon 2008). The finder of fact must consider the nature of the wrong, the character of the conduct involved, the degree of culpability of the defendant, the situation and sensibilities of the parties involved, the extent to which the defendant's conduct offended a public sense of justice and propriety, and the net worth of the defendant. *Id.* § 41.011(a) (Vernon 2008). Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of either (1) two times the amount of economic damages plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000, or (2) $200,000. *Id.* § 41.008 (Vernon Supp. 2011).

Here, the exemplary damages awarded—$667,000—were not greater than two times the amount of economic damages found—$3,961,524.60—and did not exceed $750,000. Therefore, the award did not violate statutory and constitutional constraints. *See id.* Moreover, the evidence recited above is sufficient to support the jury's finding that the evidence of fraud was clear and convincing and that the nature of the wrong, the degree of Cypress's culpability, the situations and sensibilities of the parties, the extent to which Cypress's conduct offended a public sense of

justice and propriety, and Cypress's net worth justified the imposition of the $667,000 in exemplary damages awarded to Fazio. *See id.* § 41.011. Therefore, I would hold that the trial court erred in granting JNOV on the issue of exemplary damages.

I would sustain Fazio's fifth issue.

### Conclusion

I would reverse the trial court's rendition of judgment notwithstanding the verdict and remand the cause to the trial court to render judgment on the verdict in favor of the Fazios for the reasons set out in this opinion.